[Civ. No. 1479. Third Appellate District.—May 2, 1916.]

## CLAUS A. SPRECKELS et al., Respondents, v. STATE OF CALIFORNIA, Appellant.

INHERITANCE TAX LAW—TRANSFERS IN CONTEMPLATION OF DEATH—POSSESSION OR ENJOYMENT AFTER DEATH—QUESTIONS OF FACT.—Under the Inheritance Tax Law of 1905 (Stats. 1905, p. 341), whether transfers of property are made "in contemplation of death," or "intended to take effect in possession or enjoyment after the death" of the donor, are questions of fact.

ID.—MEANING OF PHRASE "IN CONTEMPLATION OF DEATH."—The phrase "in contemplation of death," as used in the Inheritance Tax Law, relates to transfers made when contemplation of death is the motive which prompts the transfer, and does not have reference to that general expectation of death which is the essential concomitant of the inherent knowledge of the inevitable termination of all life.

ID.—GIFTS OF CORPORATE STOCK BY MOTHER TO CHILDREN—EVIDENCE—TRANSFER NOT IN CONTEMPLATION OF DEATH.—Under the Inheritance Tax Law gifts of corporate stock made by a mother to her children at a time when she was of the age of seventy-nine years, and suffering from a serious and dangerous heart affliction which caused her death a few weeks after the making of such gifts, are not made "in contemplation of death," and therefore not subject to taxation, where it appears that the donor had often declared her

intention of giving the property to the donees *in her lifetime*, and that she at the time of such gifts harbored no thought of immediate death.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Frank J. Murasky, Judge.

The facts are stated in the opinion of the court.

Hartley F. Peart, Robert A. Waring, U. S. Webb, Attorney-General, and Albert H. Elliot, for Appellant.

Cushing & Cushing, for Respondents.

HART, J.—Shortly prior to her death, Anna C. Spreckels, the mother of the plaintiffs, made to the latter gifts of certain corporate stock. The defendant claimed, as it still claims, that the gifts were made in contemplation of the death of the donor and to take effect after that event and that, therefore, the transfers were and are subject to taxation under and by virtue of the provisions of the statute known as the Inheritance Tax Law.

This action was instituted by the plaintiffs for the purpose of obtaining a decree quieting their title to the property involved in the said transfer as against the said claim of the defendant.

Findings and judgment were in favor of the plaintiffs, and the appeal here is by the defendant from said judgment.

On the twenty-sixth day of December, 1908, Claus Spreckels, a California pioneer and a San Francisco citizen of note and enormous wealth, died testate, in the city of San Francisco, leaving a vast amount of real and personal property, moneys, mortgages, and bonds. Surviving him were his widow, Anna C. Spreckels, and five children, among the latter the plaintiffs herein, all said children being the issue of said deceased and said Anna C. Spreckels. The entire estate left by the deceased belonged to the community.

On the thirty-first day of July, 1909, articles of incorporation of a corporation designated and named "San Christina Investment Company" were filed in the office of the county clerk of the city and county of San Francisco, Mrs. Spreckels having caused the said corporation to be organized under

and by virtue of the laws of the state of California.  The general purposes of said corporation, as the same are stated in its articles, were to acquire, sell, and deal generally in real estate, to build upon and otherwise improve the same, and to carry on and do all things necessary for the profitable management of said properties for any purpose or purposes to which they might be put, and to buy, sell, pledge and generally deal in stock, bonds, and obligations of corporations, public or private, "and personal property of any kind." The special motive prompting Mrs. Spreckels to organize said corporation was to employ it as an instrumentality for properly conserving, handling, and managing with profit her vast and varied property interests, and to transfer all said interests in the form of stock to the plaintiffs herein.

On the fourteenth day of September, 1909, in pursuance of a petition previously filed therefor, the superior court of the city and county of San Francisco, sitting in probate, made and entered its decree of partial distribution of the estate of the said Claus Spreckels, deceased, whereby it distributed to the widow, Anna C. Spreckels, her community share thereof.

On the eighth day of November, 1909, "said Anna C. Spreckels made, executed and delivered to said San Christina Investment Company a deed wherein and whereby she conveyed to said corporation all the real property so distributed to her by said decree of partial distribution, and other real property situate in the state of California, but no personal property whatsoever. . . . That thereafter, to wit, the 19th day of January, 1910, said Anna C. Spreckels transferred and conveyed to said San Christina Investment Company certain personal property situate within the state of California, being part of the personal property distributed to her under said decree of partial distribution aforesaid, and other personal property.  That said deed so delivered on November 8th, 1909, was delivered to said San Christina Investment Company in consideration of thirty-five thousand (35,000) shares of the capital stock of said corporation then issued to Anna C. Spreckels therefor, and said transfer and conveyance of January 19, 1910, was made to said corporation in consideration of fourteen thousand nine hundred ninety-seven (14,997) shares of the capital stock of said corporation then issued to said Anna C. Spreckels.  That except as in this paragraph of these findings set forth, no conveyance or transfer of real or per-

sonal property was at any time made by said Anna C. Spreck-
els to said San Christina Investment Company; that there-
after and on the 20th day of January, 1910, said Anna C.
Spreckels delivered all of said shares of stock of said San
Christina Investment Company so received by her as in these
findings set forth, except three (3) shares thereof, to these
plaintiffs as a gift, all as set forth in paragraph II of these
findings. That said shares so given to plaintiffs are not and
were not all the issued shares of said corporation, but are
and were all of said issued shares except six (6) other shares,
and were at the time of said gift evidenced by a single cer-
tificate of said corporation issued to said Anna C. Spreckels
on the 19th day of January, 1910, for said forty-nine thou-
sand nine hundred ninety-four (49,994) shares, the same being
a portion of the shares issued to said Anna C. Spreckels as
aforesaid, and being the same shares referred to in paragraph
II of these findings.''

On the fifteenth day of February, 1910—less than one month
after making the gifts in question—Mrs. Spreckels passed
away. She was then a few months beyond the age of seventy-
nine years. For many years prior to her death she had suf-
fered from chronic heart trouble, technically called ''myocar-
diac disease.''

The answer alleges, upon information and belief, that Mrs.
Spreckels filed the petition for partial distribution of the
estate of her deceased husband, Claus Spreckels, and so sought
and obtained a decree of partial distribution of said estate to
be made to her, and thereafter transferred all her properties
to the San Christina Investment Company, and thereupon
''caused certificates for the capital stock thereof to be issued
and delivered to the plaintiffs herein as hereinbefore alleged
in contemplation of her death and that the said conveyances
and transfers were intended to take effect in possession and
enjoyment as to the grantees and transferees therein named,
the plaintiffs herein, after her death.''

As before indicated, the defendant's claim of right to the
payment of a tax upon the properties involved in the gifts
above described is based upon section 1 of the statute passed
by the legislature of 1905 (Stats. 1905, p. 341), commonly
known and referred to as the ''Inheritance Tax Law.''

So much of said section 1 of the Inheritance Tax Law as is
material to the solution of the ultimate question presented by

this appeal reads: "All property which shall pass, by will or by the intestate laws of this state, from any person who may die seized or possessed of the same while a resident of this state, or if such decedent was not a resident of this state at the time of death, which property, or any part thereof, shall be within this state, or any interest therein, or income therefrom, which shall be transferred by deed, grant, sale or gift made in contemplation of the death of the grantor, vendor or bargainor, or intended to take effect in possession or enjoyment after such death, to any person or persons, . . . shall be and is subject to a tax. . . . "

The court found as follows: "That said Anna C. Spreckels did not cause said petition for partial distribution of the assets of the estate of said Claus Spreckels, deceased, to be made and filed, or made, or filed, in her behalf, or said decree or partial distribution thereof to be made to her, or make, execute and deliver, or make, or execute, or deliver said deed to said San Christina Investment Company, or transfer or convey said personal property or any part thereof to said last named company, or cause said certificates of capital stock therein, or any certificate of capital stock, or any share of capital stock in said San Christina Investment Company, to be issued and delivered, or issued, or delivered, to plaintiffs herein or any thereof, or at all, in contemplation of her death, and neither the said acts aforesaid nor any thereof were made or done by her in contemplation of her death."

The court further found that the transfers above referred to were not, nor any thereof, intended to take effect in possession and enjoyment or in possession or enjoyment, as to the grantees or transferees therein named (the plaintiffs herein) or either or any thereof, after the death of Mrs. Spreckels, "but each and all of said conveyances, transfers and said gifts were intended to and did take effect in all and every respect and for every purpose, immediately upon the making thereof, respectively and prior to her death."

It is also found that six shares of stock in the said investment company were given and transferred by Mrs. Spreckels to other persons or corporations, but were not so given and transferred in contemplation of her death, nor the enjoyment and possession of the same intended to be or were postponed until after her death, but that the gift and transfer of said six shares was absolute, and that the transferees thereof, as

was true of the plaintiffs with respect to the above-mentioned gifts and transfers to them, immediately and prior to the death of Mrs. Anna C. Spreckels entered into the possession and enjoyment of said property in each and every respect and for every purpose.

It is obvious that the *punctum saliens* of this controversy is whether the gifts of Mrs. Spreckels to the plaintiffs were made in contemplation of her death within the meaning of the legislative intent of the above section, or made with the intention that they were to take effect in possession or enjoyment after such death; and it is equally obvious that the questions whether the gifts herein in controversy were made by the donor "in contemplation of death," within the meaning of the law, and such transfers were "intended to take effect in possession or enjoyment after the death" of the donor, are those of fact. (*Estate of Reynolds,* 169 Cal. 600, 603, [147 Pac. 268, 270]; *People* v. *Kelley,* 218 Ill. 509, [75 N. E. 1038, 1039]; *In re Benton,* 234 Ill. 366, [14 Ann. Cas. 107, 18 L. R. A. (N. S.) 458, 84 N. E. 1026]; *Matter of Thorne,* 162 N. Y. 238, [56 N. E. 625].) It is, therefore, readily to be perceived that the solution of the ultimate proposition submitted by this appeal must depend upon whether there is evidence in the record which affords sufficient support to the findings above quoted and referred to.

There is no ground or reason arising in the evidence for doubting that Mrs. Spreckels intended that the gifts or transfers in question were to take effect immediately upon the execution thereof, that the donees were to enter into immediate possession and enjoyment of the properties or stock so transferred and before her death, and that said donees (the plaintiffs) did, immediately upon the execution of the gifts and before the death of Mrs. Spreckels, enter into the possession and enjoyment of said properties. Indeed, the evidence upon this phase of the controversy stands in the record undisputed, and, therefore, so far as this record is concerned, is conclusive upon that point. It follows that the only question here is whether the gifts were made in contemplation of the death of the donor within the true intent and contemplation of the statute.

We are convinced that the finding that the gifts in controversy were not so made is sufficiently fortified by the evi-

dence to preclude any just interference therewith by this court.

First, it will be well to inquire into the legislative meaning and scope of the language, "in contemplation of death," as that phrase is used in the statute.   It certainly cannot justly be held that the purpose or the intention of the legislature was, by the law in question, to subject every transfer of property by gift to the burden of the inheritance tax.   Obviously (in other words), the language referred to was not intended to include that general expectation of death which is the essential concomitant of the inherent knowledge of the inevitable termination of all life, and which is in the young and the physically robust as well as in the aged and the infirm.   No similar statute has been so construed.   A reasonable and just view of the law in question is that it is only where the transfer of property by gift is immediately and directly prompted by the expectation of death, that the property so transferred becomes amenable to the burden.   Or, as counsel for the respondents with singular aptness states the proposition: "It is only when contemplation of death is the motive without which the conveyance would not be made, that a transfer may be subjected to the tax."   That is, the expectation of death must be the direct, specific, and immediate animating cause of the transfer.   Or, as the proposition is perhaps the more lucidly explained as follows in Ross on Inheritance Taxation, section 117, referring to the words, "in contemplation of death," as they are used in statutes authorizing the subjection of property transferred by gift to the burdens of an inheritance tax.   "They are intended to cover transfers of persons who are prompted to act by reason of the expectation of death and who thereby accomplish transmissions of property in the nature of testamentary dispositions.   The words do not refer to that general expectation commonly entertained by all persons, but rather to that apprehension which arises from some existing condition of body or some impending peril."

Again, in Andrews on the Transfer Tax Law of New York, page 172, it is said: "The statute was evidently intended to reach absolute transfers of property when made under certain conditions, viz., when the transferrer was contemplating death. That is, the thought of death has taken so firm a hold on his mind as to control and dictate his actions regarding his prop-

erty and the business is transacted while contemplating death and considering what conditions would arise or exist in the event of death without making the transfer, or, to be more specific, the contemplation of death is the sole motive and cause of the transfer; . . . but if made with other motives and for other causes it is not taxable no matter when made, as it cannot be presumed that the legislature intended to place any limitation upon the inherent right of a person to give away his property whenever, and to whomsoever, he desires."

The views thus expressed upon the meaning of the words referred to are in harmony with those to be found in all the cases. (See *State* v. *Pabst*, 139 Wis. 561, [121 N. W. 351]; *Rosenthal* v. *People*, 211 Ill. 309, [71 N. E. 1122]; *People* v. *Burkhalter*, 247 Ill. 600, [139 Am. St. Rep. 351, 93 N. E. 379]; *In re Dessert's Estate*, 154 Wis. 320, [Ann. Cas. 1915B, 1084, 46 L. R. A. (N. S.) 790, 142 N. W. 647].) And, as we understand the case of *Estate of Reynolds*, 169 Cal. 600, 603, [147 Pac. 268, 270], there is no expression therein with which the views above expressed conflict. In that case, Mr. Justice Henshaw criticises the construction put upon a similar statute of the state of New York by the courts of that state, it having at first been held by those courts that a transfer of property "in contemplation of death" within the meaning of the Inheritance Tax Law of said state meant a gift *causa mortis*, and that the law was "applicable to no other kinds or characters of transfers." Judge Henshaw, referring to the New York decisions, said in the Reynolds case: "Nothing in our law compels us to adopt the restricted construction put by the courts of New York upon their own statute and everything in our law directs that a liberal construction should be placed upon it to the end that its provisions may not be evaded." The Reynolds case was decided in the year 1912 after the legislature of 1911 had, among other changes, added the following provision to our Inheritance Tax Law: "The words 'contemplation of death,' as used in this act, shall be taken to include that expectancy of death which actuates the mind of a person on the execution of a will, and in nowise shall said words be limited and restricted to that expectancy of death which actuates the mind of a person in making a gift *causa mortis;* and it is hereby declared to be the intent and purpose of this act to tax any and all transfers which are made in lieu of or to avoid the passing of the property transferred by testate or

intestate laws.'' This amendment, as was said of it in the
Reynolds case, in no manner changed the law as it stood prior
thereto, but its purpose and effect were merely to give a clearer
expression to the legislative intent and meaning of the law,
or to make certain that which might otherwise have been re-
garded as doubtful, viz., that the intent of the legislature was
to subject to the tax all property transferred as a testamentary
disposal thereof, whether such transfer was by gift *inter vivos*
or by will and testament.

With the law as we understand it thus stated, we will now
take up a consideration of the evidence. In addition to the
facts already narrated, the testimony shows: That Mrs. Spreck-
els, immediately after the death of her husband, Claus
Spreckels, in the month of December, 1908, was awarded a
family allowance of five thousand dollars per month payable
out of the estate of her deceased spouse. In addition to this
sum, she received out of the income of her husband's com-
munity share of the estate, in accordance with the terms of
his last will, the sum of ten thousand dollars per month, the
aggregate amount of her monthly income being, obviously,
the sum of fifteen thousand dollars.

Claus A. Spreckels, one of the plaintiffs herein, testified
that, shortly after his father's death, his mother, Anna C.
Spreckels, talked with him about forming a corporation as an
instrumentality for handling her enormous properties and
business interests. The organization of such a corporation
for such purpose, testified the witness, wholly originated in
the mind of Mrs. Spreckels herself, and without any sugges-
tion from him regarding the proposition. Thereafter, Mrs.
Spreckels frequently brought the matter up in conversation
with the witness and appeared to be insistent in her intention
to form a corporation for the purpose indicated. She said
to the witness, long before the transfer, that she was receiving,
with the family allowance and the amount coming to her
monthly from her deceased husband's interests, an enormous
sum—in fact, a much larger sum than she could ever use—
and that it was her desire and intention at that time (she
said) to distribute part of her belongings to her three children,
the plaintiffs. These conversations occurred in the year 1909,
at which time Mrs. Spreckels was about seventy-seven years
of age. The witness proceeded to say that at no time in any
of the conversations referred to did Mrs. Spreckels speak

about dying or preparing for death. On the contrary (continued the witness), she frequently spoke of refurnishing her Van Ness Avenue residence, which had been damaged to some extent by the 1906 fire, and which damage she had, early in the year 1909, caused to be repaired, with the purpose of again occupying it as her permanent home. She stated in said conversations, and in conversations had just prior to and at about the time of the transfers in question, that she intended going to Europe for the purpose of obtaining suitable furnishings for her Van Ness Avenue residence and at the same time paying a visit to her daughter, Mrs. Ferris (one of the plaintiffs herein), who was then a resident of London. The witness declared that on no occasion, when speaking of organizing the San Christina Investment Company, and of giving certain of her interests to the plaintiffs, did Mrs. Spreckels say or intimate that her purpose in forming the corporation and then transferring her property to her three children was to avoid probate proceedings. She merely said on all occasions that her intention was to transfer her interests to said three children, they to take immediate possession thereof upon the consummation of the transfer.

Referring to the general state of Mrs. Spreckels' health during the year 1909, the witness said that at times she would be ill, while at other times she appeared to be in the enjoyment of fairly good health. The opinion of the witness was that her death was due to the ravages of old age and a general breaking-down of her physical organization.

Rudolph Spreckels, a plaintiff herein, corroborated the testimony of Claus A. Spreckels in all substantial particulars. He declared that the purpose of his mother, Mrs. Anna Spreckels, as expressed by her, in forming the San Christina Investment Company was to transfer all her property to said company and then give said property or the stock of said corporation to the three children, the plaintiffs. She declared to the witness that she desired that said three children should receive from her said property "so that the same might be used and enjoyed by them during her lifetime." The witness continued: "My mother at that time was receiving a substantial income from my father's estate as a family allowance by the court. She had no other source of income. She owned the Van Ness avenue house individually and also owned a piece of property in the Hawaiian Islands. The property

on Van Ness avenue and that in the Hawaiian Islands were residence properties and were not income producing. Under the trust clause of my father's will and from a family allowance my mother was in receipt of approximately $15,000.00 a month. My mother did not express any desire in her conversations with me in reference to her property to avoid the cost and delays of probate, nor did she offer any opinion in reference to attorneys and attorneys' fees. Q. Did she give any reason at all other than her wish to have you three children enjoy the fruits of this property? A. That was the entire purpose of it; I think I can say that definitely, that it was her intention at the very beginning, that this was to come to the children.''

The witness testified that in all his conversations with his mother relative to her property affairs, and the transfer of the same to the plaintiffs, she never referred to her death until about three days prior to the date of that event. On that occasion, she said to the witness, ''Well, I wonder when I will be able to get up again, or if I will get up.'' The witness declared that Mrs. Spreckels first became ill so that she needed the care of a physician in the month of April following the death of her husband. ''I recollect that she went to Aptos (Santa Cruz county) in the summer of 1909. I visited her there on two occasions. Up to the time that my mother was taken ill after my father's death, she had always enjoyed good health. She had a strong constitution. She had been very active for her years, exceedingly so. . . . Dr. Baum succeeded Dr. Richter as the physician for my mother during her illness. I had not known Dr. Baum until that time. The change was made, I think, at the instance of my mother. She was a little impatient that she wasn't able to get out, as she was a woman who had always enjoyed good health and had a good constitution, and she thought that perhaps under other treatment she could get out more rapidly. She was restive under the doctor's treatment. Q. Did she ever express herself in that way, that she wanted to get out more rapidly? A. Yes, sir, she felt that she wanted to have more freedom of action. She didn't enjoy the diet, or matters of that sort. Q. She expected to go out? A. She did, most decidedly. She anticipated, of course, going abroad. She was exceedingly anxious to be with my sister at the time of the birth of her child, which was expected in June (1910) and did

actually occur on June 28th, I think; my sister's first and only child; and, of course, she was particularly anxious to be with her daughter under those circumstances. She had repeatedly spoken to me on that subject. My sister expected my mother to be with her because she left, I think, some time in January—probably within a month prior to my mother's death. Of course, that was not anticipated.''

Charles S. Cushing, the attorney who prepared Mrs. Spreckels' will, and who prepared the papers and initiated and completed the necessary legal steps for the formation of the San Christina Investment Company, testified, in part: ''At the time the stock in question was transferred to the plaintiffs here I was a witness to the indorsement. I had a talk with Mrs. Spreckels as her attorney in reference to this transfer. She expressed no other reasons at that time for transferring the stock other than is substantially shown on the back of the certificate. She said she wanted to give it to her three children. She certainly did not mention at that time her desire to avoid the expense of probate and she did not mention anything in connection with her own death. Nor did she mention anything regarding the avoidance of a will or anything of that kind.''

Anna C. Brommer, a niece of Mrs. Spreckels, had lived with the latter and was continually her companion and confidante as to her private affairs for a period of about fourteen years down and prior to the time of Mrs. Spreckels' death. This witness testified that Mrs. Spreckels often discussed her business affairs with her (the witness), and had frequently, after the death of her husband, spoken of forming a corporation to which she intended to transfer the bulk, if not all, of her property. ''I cannot recall,'' said Miss Brommer, ''the first conversation I had with her about giving her property to her three children. I could not distinguish one conversation from another. The substance of these various conversations by Mrs. Spreckels was that she had ample means for herself and that she wished her three children to have this stock, and that she wanted to give this to them share and share alike. . . . She never stated to me as a reason for making this transfer that she wanted to avoid any possibility of contest or probate expense or anything of that kind. I knew that Mrs. Spreckels was repairing the family residence on Van Ness avenue. I assisted her in the ideas in fixing it over.

It was her intention to take up her residence in that mansion. Her idea of going to Europe was to purchase the furnishings for the house. She spoke to me about that. She told me that she intended to move over to the Van Ness avenue house as soon as it was completed. She thought of going to Europe first and then in the spring of 1910 it might be completed. She intended to go to Europe in the spring of 1910. She did not say how long she expected to stay in Europe, but expected to be with her daughter in June, and then expected to come back and take up her residence at the Van Ness avenue property. . . . Her conversations with me about her affairs were rather intimate. . . . She did not suggest that a better way of disposing of property was by deed or stock; nor did she suggest anything about avoiding probate. She never expressed herself as to lawyers and lawyers' fees. The day she transferred the stock in question she seemed more cheerful than at any other time during her illness. That would extend over the year 1909. . . . The day of the transfer of the stock in question Mrs. Spreckels came downstairs. We had a good dinner that night. She was very cheerful that day. During 1909 Mrs. Spreckels would almost every day come into the sitting room which was the next room to her bedroom and sit in there. There were periods though for probably a week or ten days at a time when she remained in bed. The periods in which she remained in bed occurred more frequently in the early part of 1909. She became ill in April, 1909, and in June, 1909, she was very much better and went down to the country for two or three months, and seemed quite well, and then she was not so well about December. She had a relapse probably a week or so after January 20, 1910, and was confined to her bed. . . . Mrs. Ferris (one of the plaintiffs) was here in the latter part of 1909. She lives in England and returned there. She became the mother of a daughter there in June, 1910. That was one of the reasons why Mrs. Spreckels thought of going to Europe."

Dr. C. M. Richter, Mrs. Spreckels' physician, testified that he professionally attended her at various times from the middle of April, 1909, until the tenth day of January, 1910. Mrs. Spreckels was suffering from myocarditis, a chronic inflammation of the muscular valves of the heart, the effect of which was that "she had very irregular action of the heart

and short breath, and weak feeling, troubles of circulation in all parts of the body." The doctor stated that when he was first called in to see Mrs. Spreckels "she had apparently had that trouble for some time before—perhaps for years. . . . During the period I attended Mrs. Spreckels she was not confined to her bed from this illness. . . . Probably from the middle of April to the middle of June, 1909, I visited her almost daily and then she went to the country until about the middle of August, and from that time on I saw her more regularly until December and January I saw her every day. There was really no material difference in her condition in December, 1909, and January, 1910, as compared with her condition in April, 1909. It was approximately the same. . . . The treatment I prescribed was principally rest and some heart medicine and some diet. I advised a trip to the country, which she took, but her condition was not materially improved by reason of this trip. I knew that she was contemplating a trip to Europe. I often spoke to her about it and I told her she might make such a trip in the summer of 1910 without much trouble, just as she had gone to Aptos. . . . During this time she was in a condition so that she could go about the house from one room to another. She had to avoid any prolonged physical strain because she was extremely heavy in weight. She could walk some distance but she was careful about it." The doctor declared that, while such an affliction as that from which Mrs. Spreckels was suffering might suddenly terminate fatally at any time, still one with that disease might live many years and finally die from some other cause. "I did not see any reason whatever," he continued, "why she would not live for some time. . . . I should think she was in as good health on January 10, 1910, when I last saw her, as she had been during the previous months. . . . We discussed this European trip a number of times. I gave her no reason to believe that she could not take the trip. On the contrary, I advised her that she might safely take it. I saw no reason at the time I left her to anticipate a fatal termination of her illness in the immediate future and so far as I know she had no reason to anticipate such a result. Q. As I understand your answers to some of my questions, they were that a person suffering from this particular kind of illness would be liable to sudden death at any time, is that right? A. Not that it would be, but could be. Q. The fact that Mrs. Spreck-

els was of the age of about seventy-seven years at this time, and had suffered for many years from this illness, you would not say that those two conditions would make it probable that she could reasonably expect to die at most any time? A. No, I couldn't say that. It is our experience that such people may live for years.'' The doctor further stated that he did not attend Mrs. Spreckels in her last illness; a Dr. Baum, who had died prior to the time of the trial of this action, having professionally attended her then and up to the time of her death. (The record is silent as to the specific cause of her death, so far as the opinion of a physician is concerned.)

We have now stated in substance all the testimony necessary to be considered here which was presented at the trial.

Counsel for the appellant declare that no conflict arises in the testimony, but they insist, or, at any rate, the necessary effect of their position is, that the natural and, indeed, the only logical conclusion which may follow from the evidence is that Mrs. Spreckels transferred by gift the property in question in contemplation of her death, within the true sense of that language of the statute—that is to say, that the contemplation of her death was the direct and impelling motive for the transfer. In support of this position, it is pointed out that Mrs. Spreckels, at the time of the execution of the transfer, was a woman of venerable years, at best not far removed from the natural end of her life; that, for many years prior to and up to the time of the transfer, she had been a chronic sufferer from a serious and dangerous heart affliction, which was of a nature that from it her death might suddenly occur at any moment, a condition of which undoubtedly she possessed a keen realization; that, as a matter of fact, her death occurred within a few weeks after she made the transfer.

It may be conceded that the testimony thus referred to and emphasized by counsel for the appellant as supporting their theory of this case is reasonably susceptible of the inference which they vigorously contend naturally and logically follows therefrom, and if that testimony embraced all that had been submitted to the consideration of the trial court, we might, perhaps, be able or possibly required to hold that, as a matter of law, the finding that the transfers were not made in contemplation of her death, according to the true import of that language as it is used in the law, was not sus-

tained. But, as clearly appears from the above statement of the testimony, there is other testimony in the record which must be considered in determining the vital question presented. Briefly to recapitulate: Shortly after her husband's death, in 1908, Mrs. Spreckels expressed her intention of forming a corporation for the avowed object of transferring her property thereto. She had often declared her intention of giving her property to the plaintiffs, and to Mr. Rudolph Spreckels stated that her desire was that her children, the plaintiffs, should own and enjoy the property *in her lifetime*. These ideas seemed, at all times and long prior to the date of the transfers, to have constituted the central thoughts of her mind until their crystallization by the organization of the investment company, the immediate transfer of the greater part of her estate thereto and thereupon the transfer of the stock thereof to the plaintiffs. Under the circumstances, it was, without any thought of her own death, or without any view to preparation therefor, a most natural thing for her to do. At her then advanced age, having other means far more than necessary for her own maintenance for the remainder of her life, she doubtless conceived that she would, in her declining days, be the happier if relieved of the heavy burden and serious responsibilities which necessarily go with the control and management of vast and varied property interests, such as she was the owner and possessor of, and that, in obtaining release from these burdens, her happiness would be the more certainly assured by transferring her property to her children so that they might own and enjoy it in her own lifetime. While she was afflicted with a serious heart affection, and suffered intermittent spells of illness which temporarily confined her to her bed, it is evident that she did not, at any time prior to the date of the transfers, harbor the thought that her life was in immediate peril from her malady, or that she would not live for many years to come. This is shown by the fact that she was, in the year 1909, having her Van Ness Avenue mansion repaired preparatory to her own reoccupancy of it, and by the further fact that down to the very occasion on which she transferred the stock to the plaintiffs she discussed and was contemplating a trip to Europe, not alone for the purpose of visiting her daughter and being with her at the time of the latter's expected *accouchement*, in June, 1910, but with the further declared ob-

ject of purchasing appropriate furnishings for her Van Ness Avenue residence. Indeed, even during the period of her last illness, she indicated a belief that she would be restored, or, at any rate, appeared not to have relinquished hope for her recovery; for, addressing Rudolph Spreckels, she said: "I wonder when I will be able to get up again, or if I will get up." Then there is the testimony of Dr. Richter, for a long time the family physician, who said that, while the malady with which Mrs. Spreckels was afflicted might suddenly terminate fatally at any time, it would not necessarily so terminate, and that with it she might still live very many years, she being a woman naturally of strong and robust constitution. He further testified that he advised Mrs. Spreckels that she could safely take her contemplated European trip.

From the evidence thus briefly repeated, the inference is reasonable and logical that there was no thought of immediate death in Mrs. Spreckels' mind when she made the gifts in question, and that the direct and impelling motive for said transfers was not that of the contemplation of her death within the meaning of the law.

Admitting, then, as counsel for the appellant point out, that there is testimony from which the opposite inference is reasonably deducible, is this court, under such a state of the record, legally justified in holding that the court below should have drawn that inference and so found in favor of the defendant? Is it within the legal province of an appellate court in a case where, as here, either of two diametrically opposing inferences—one in favor of the appellant and the other in favor of the respondent—may justly and reasonably be drawn from the proofs, to say that, as a matter of law, the trial court should have found in favor of a particular party to the action, or, in this case, should have drawn that inference, of which the evidence may for the purposes of this discussion be conceded to be susceptible, which would have justified findings in favor of the appellant? The rule suggested by these questions is, it would seem, too well settled to require their restatement. We will, however, reproduce here the expressions of a few of the cases with regard to it.

In the case of *Reay* v. *Butler*, 95 Cal. 206, 214, [30 Pac. 208], it is said: "This court can rightfully set aside a finding for want of evidence only where there is no evidence to sup-

port it, or where the supporting evidence is so slight as to show abuse of discretion.''

In *Dallman* v. *Frank*, 1 Cal. App. 541, [82 Pac. 564], per Mr. Justice Harrison: ''The findings of a court, like the verdict of a jury, will be upheld in the appellate court if there is any evidence which, *by reasonable construction*, tends to support such findings; and in making its decision the trial court is at liberty to take into consideration, not only the testimony given at the trial, but also all inferences of fact which may be reasonably drawn from the facts established by such testimony. . . . Although the appellate court may be of the opinion that, on the evidence in the record, it would have reached a different conclusion, it is not for that reason authorized to set aside the findings of the trial court. If the evidence is such that reasonable men may reach different conclusions thereon the finding of the trial court must be sustained.''

In *Huston* v. *Anderson*, 145 Cal. 320, [78 Pac. 626], Mr. Justice (now Chief Justice) Angellotti said: ''The evidence was such that it might have sustained a contrary finding, but not such as to warrant us in disturbing the finding of the court below.''

There are innumerable other California cases to the same effect.

Conceding, then, that the court below could have justly concluded from the evidence that Mrs. Spreckels made the transfers in question in contemplation of her death, within the purview of the Inheritance Tax Law, the rule stated and applied in the above cases has peculiar application to this case, since, as we have clearly shown, the evidence was such as to have reasonably warranted the conclusion arrived at therefrom by the trial court and which conclusion is evidenced by the findings upon which the judgment herein is planted. It is, therefore, plainly and clearly apparent that the findings here cannot, with legal propriety, be interfered with by this court.

The length of this opinion, due mainly, as will be observed, to the extended statement of the testimony which was conceived to be essential to a clear appreciation of the conclusion to which we have been led, as well as eminently proper because of the importance of the issue presented, forbids a review herein of the many cases cited by the appellant in support of the hypothesis upon which its learned counsel with singular

ability have attempted to overthrow the judgment. Indeed, we have not thought it necessary to review those cases, with whose reasoning and conclusions we perceive no occasion to quarrel; for, after all, each case arising under the statute in question, as to whose meaning and intent in the particular concerned here there can be found no ground for disputation, must rest upon its own peculiar facts, and the adjudicated cases can, as a rule, do little, if any, more than to illustrate the application of the law to the particular facts of particular cases.

For the reasons herein given, the judgment appealed from is affirmed.

Chipman, P. J., and Ellison, J., *pro tem.*, concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 29, 1916.