APPEAL OF SPENCER BORDEN, JR., EXECUTOR, ESTATE OF SPENCER BORDEN.

Docket No. 5909.    Promulgated February 19, 1927.

Trust created by decedent prior to his death *held* not to have been made in contemplation of death.

*Douglas C. Law, Esq.,* and *Richard K. Hawes, Esq.,* for the petitioner.

*R. E. Copes, Esq.,* and *E. G. Smith, Esq.,* for the Commissioner.

This is an appeal from the determination by the Commissioner of a deficiency in estate tax of $37,658.12. This deficiency arises in part from an increase in value of the gross estate by including therein $525,000, representing the value of 5,000 shares of the common stock of the Fall River Bleachery, which were transferred and delivered by the decedent on May 20, 1921, to trustees in trust for his wife and four children.

#### FINDINGS OF FACT.

The petitioner is the regularly appointed, qualified, and acting executor of the estate of Spencer Borden, who died October 17, 1921, at the age of seventy-one, a resident of Fall River, Mass.

On May 20, 1921, the decedent transferred, irrevocably, 5,000 shares of common stock in the Fall River Bleachery of the value of $525,000 to trustees, in trust with direction to pay the net income to his wife, his two sons and his two daughters, in equal shares, during the lifetime of the wife, and upon her death to distribute " the principal of said trust and all accumulations of income, free and discharged from all trusts hereunder, in equal shares, to the said Spencer

Borden, Jr., Alfred Borden, Leonora Borden Trafford, and Florence Borden Darrach * * * the descendants of any of said children deceased prior to the distribution of said principal, as herein authorized, to take the ancestors' share by right of representation."

Prior to this transfer, Spencer Borden owned the entire common stock in the Fall River Bleachery and the 5,000 shares transferred represented one-half his holdings in that company.

The Fall River Bleachery had been organized and developed by the decedent and his income was derived principally from dividends and salary from that company.

At the time of the transfer and for many years prior thereto Spencer Borden, Jr., a son of the decedent, was treasurer of the company and in that position had control of the finances and supervision of the books of the company. He also prepared the income-tax returns of his father for the years 1916 to 1920, inclusive, and paid the tax from the treasury of the company, charging his father's account with the amount of the tax.

In 1919, Spencer Borden, Jr., became concerned over the increasing size of his father's Federal income taxes and discussed the matter with his father and their attorney, with a view to finding some plan whereby they might be lowered. It was decided to reduce his father's salary for the year 1920 and to pay whatever income he might receive from the Bleachery in dividends rather than salary, thus avoiding the Federal normal tax. The comparative result of this plan was as follows:

| Year. | Salary. | Dividends. | Year. | Salary. | Dividends. |
|---|---|---|---|---|---|
| 1916 | $48,000.00 | $20,000.00 | 1919 | $80,037.35 | $20,000.00 |
| 1917 | 86,000.00 | 20,000.00 | 1920 | 12,000.00 | 143,000.00 |
| 1918 | 80,000.00 | 20,000.00 | | | |

The decedent, his son, and their attorney continued over a period of several months to discuss methods of handling the decedent's affairs in such a way as further to reduce taxes. For some years decedent had made annual allowances of $12,000 to his wife and $6,000 to two of his children, and it was finally determined that the establishment of the trust in question provided the best means of lowering the taxes. The purpose of the trust was expressed in a letter of April 9, 1921, by the son to the father, who was then in Augusta, Ga., reading in part:

In a nut-shell the plan is to put a certain amount of your Bleachery common stock into a trust. As you know there is a certain amount of your income you never get anyway, that which goes to Mother, Alfred and Florence. My idea was that there is no need of your reporting that income as yours but by putting the property in trust, during the life-time of Mother and having it go direct to the parties who get it anyway it cuts that much of the income,

Of course it adds to the income of the recipients but the rates are very much less. This is very rough but when the papers are drawn I will send them to you for criticism with explanations.

It is perfectly possible, however, to let the thing wait until you come home. I will have it all in completed form by that time.

Spencer Borden, Sr., returned home from Augusta, Ga., some time in the latter part of April, 1921. After his return there were further discussions of the trust plan between the decedent, his son, and their attorney. Both told their attorney that they wanted the trust established because it would reduce the Federal income tax. The trust agreement was drawn and revised until satisfactory to the decedent and was finally executed and the 5,000 shares of Bleachery stock transferred to the trustees on May 20, 1921.

At the time of the transfer and prior thereto the decedent was an active, energetic man, who rode horseback and played golf. When in Fall River he visited his office regularly and attended to business. He made frequent trips to two stock farms which he operated, and each year spent a part of the winter at his place in Augusta, Ga.

For some years before the transfer, and at that time, he had heart trouble, which evidenced itself to him in irregular beating at times and in shortness of breath upon extraordinary exertion. He did not take his heart trouble seriously and disregarded his physician's advice to slow down a little in his work. During the discussion of the trust with his attorney, Borden did not indicate in any way that he was in other than good health or that he had any apprehension concerning death.

In April, 1920, while at his farm at Woodstock, Vt., he consulted a local physician. The physician found that he was suffering from circulatory impairment, with moderate angina pectoris, due in the main to myocarditis. The physician gave him advice concerning his activities, which he seemed inclined to disregard.

On May 7, 1920, decedent visited his physician at Fall River. He asked him to listen to his heart; said that it was irregular and had been irregular for a good many years. The doctor examined him and found his heart action was irregular, that his heart was somewhat enlarged, and there was a slight systolic murmur. The decedent did not appear to regard his condition as serious and declined to permit a general examination, saying there was nothing else the matter with him, and that he felt fine. The doctor prescribed no medicine but advised Borden to slow down a little.

He again consulted the physician on December 8, 1920, complaining of a little shortness of breath. The doctor examined him, found his pulse a little more rapid, but no enlargement of the heart since his examination in May, 1920. The doctor prescribed a heart stimulant. The decedent spent a portion of the early months of 1921 in

79705°—28——17

Augusta, Ga., as was his custom. He continued to ride his horse and to play golf.

He died of myocarditis, or weakening of the muscles of the heart, October 17, 1921.

In computing the deficiency the Commissioner included as a part of the estate of the decedent the 5,000 shares transferred to the trustees, which he valued at $525,000.

### OPINION.

PHILLIPS: In determining the deficiency the Commissioner has included as a part of the taxable estate of the decedent the value of 5,000 shares of the capital stock of the Fall River Bleachery, set aside by the decedent in a trust fund some five months prior to his death. This has been done pursuant to the provisions of section 402 of the Revenue Act of 1918, which provides that the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated:

(c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title.

It is undisputed that the trust was not intended to take effect in possession or enjoyment at or after the death of the decedent and the sole question is whether the trust was established by the decedent in contemplation of death.

In *Spreckels* v. *State*, 30 Cal. App. 363; 158 Pac. 549, the District Court of Appeals, Third District, California, in a well considered opinion, said with reference to the words "in contemplation of death":

The language referred to was not intended to include that general expectation of death which is the essential concomitant of the inherent knowledge of the inevitable termination of all life, and which is in the young and physically robust as well as in the aged and the infirm. No similar statute has been so construed. A reasonable and just view of the law in question is that it is only where the transfer of property by gift is immediately and directly prompted by the expectation of death that the property so transferred becomes amenable to the burden; or, as counsel for the respondent with singular aptness states the proposition:

"It is only when contemplation of death is the motive without which the conveyance would not be made that a transfer may be subjected to the tax."

This statement of the law is abundantly borne out by the authorities. *Shwab* v. *Doyle*, 269 Fed. 321; *Rea* v. *Heiner*, 6 Fed. (2d) 389; *Vaughan* v. *Riordan*, 280 Fed. 742; *Rosenthal* v. *People*, 211 Ill. 306; 71 N. E. 1121; *Commonwealth* v. *Fenley*, 189 Ky. 480; 225 S. W. 154.

The evidence convinces us that in the present instance the trust was not established by the decedent in contemplation of his death. The evidence shows the decedent in 1921 to have been an active man, taking an interest in the conduct of his business; giving attention to two stock farms which he operated more as a hobby than a business, playing golf and riding horseback. He was conscious of a shortness of breath after exertion and a " skipping " of his heart. This condition does not appear to have concerned him other than as it interfered to some extent with the things which he desired to do. While at his farm at Woodstock in April, 1920, he consulted a local physician. This physician found signs of heart trouble but no serious condition and advised the decedent to lead a less strenuous life. A month later he consulted his regular physician who gave him much the same advice. The decedent refused to permit a general examination, stating that he felt all right except for shortness of breath, and failed to follow the advice given him. Some seven months later he again consulted his physician regarding the same condition. The physician found that the condition had progressed slightly and prescribed a heart stimulant. The physician again desired to make a thorough examination which the decedent refused to permit. The decedent apparently did not regard his condition as serious nor did the physician, provided the patient would take reasonable care of himself. The testimony of the physician is that he found the condition of the decedent better than that of the average man of his age and that there was no reason why, with proper care, the decedent should not have lived several years.

In the early winter months of 1921 the decedent went to his place at Augusta, Ga., as was his custom, and there followed his usual active pursuits, playing golf and riding. At no time does it appear that he considered his condition as sufficiently serious to follow the advice given him by his physician. The whole record in the case convinces us that the decedent did not at the time of the execution of the trust consider his condition serious or look forward to an early demise.

When we come to examine the circumstances under which the trust was created, we find that it was not a hasty act brought on by the realization of impending death but the culmination of many months of effort to work out some plan whereby his income taxes might be reduced. The first step was taken in 1919 when his salary from the Bleachery was materially reduced. The saving effected by this step

could not have been large and some other means of reducing taxes was sought. The evidence shows that various plans were suggested and discussed, and it was not until after several months of consideration that the plan finally followed was adopted. Even after this plan had been adopted several weeks were spent in drafting and redrafting the declaration of trust to meet the requirements of the testator. The plan was adapted to the purpose of saving income taxes by providing a capital fund from which would be paid the amounts theretofore paid directly by the decedent to his wife and children, and all the surrounding circumstances lend support to the uncontradicted testimony that the purpose of the trust was to reduce the income taxes.

To our mind the record is convincing that the trust had a purpose other than the saving of estate taxes and was not made by the decedent in contemplation of his death.

*Decision will be entered on 15 days' notice, under Rule 50.*