ANNA L. STARK LAVELLE, EXECUTRIX, ESTATE OF ARTHUR L. STARK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10587.   Promulgated October 31, 1927.

1. Certain transfers made by decedent held not made in contemplation of death.

2. Value of certain real estate determined.

*Guy Mason, Esq.,* and *Robert A. Littleton, Esq.,* for the petitioner.
*R. E. Copes, Esq.,* for the respondent.

This proceeding involves a deficiency of estate tax in the amount of $28,521.97. Petitioner contends that respondent erred in increasing the value of real estate for estate-tax purposes from $69,460 to $145,270.20, and by including in the gross estate transfers of property made by the decedent of the value of $414,003.23.

### FINDINGS OF FACT.

Arthur L. Stark died testate on October 17, 1923, and was at the time of his death an inhabitant of the State of Ohio. Anna L. Stark Lavelle is the executrix of his estate and was, during the taxable year of 1923, and on the date of the filing of this appeal, an inhabitant of the city of Elyria, State of Ohio. Anna L. Stark Lavelle, as such executrix, made the return involved in this proceeding to the collector of internal revenue whose office is located at Cleveland, Ohio.

Arthur L. Stark was born in December, 1868. He and petitioner were married July 3, 1900, at which time she was 22 years of age. No children were born to this marriage. After the death of Arthur L. Stark, petitioner married Martin A. Lavelle. The cause of the death of Arthur L. Stark was myocarditis, accompanied by a luetic infection.

Arthur L. Stark was a chemist by profession and from about 1900 was a stockholder and officer in the Harshaw, Fuller & Goodwin Co. He was the largest stockholder, vice president, and general manager of this company. It grew up under his management from a small concern in 1900 to quite a large one in 1922, at which time it had factories in three cities. He devoted all of his energies to the building up of this company, often working through the whole night; his wife spending many nights with him at the factory. From the time he became connected with the company up the year 1922, he took but one vacation. It was intended that this vacation should last two weeks but after three days Stark became restless, because of separation from his work, and returned.

Arthur L. Stark was a large, robust man. His height was 5 feet 10¾th inches and his normal weight was 233 pounds. He was a hard worker and a man of untiring energy. He always wanted to be on the go. He owned several automobiles, and when not at work took great delight in driving them. He was of a restless disposition and resented control. For many years prior to his death, he suffered from shortness of breath and wheezing whenever he overexerted himself. This condition grew gradually worse, and in May, 1922, the officers of the company became concerned about his health and requested him to take a vacation of six months in order that he might recuperate. About this time he was examined by his family physician, Dr. Cushing, who diagnosed the trouble as myocarditis with a luetic infection. He told Stark to stay at home, take a complete rest and diet. He was therefore treated by Dr. Cushing, and also in his absence by Dr. Hubbell, each of whom was a personal friend. From this time forward he was visited frequently by both physicians. Often the calls were of a social rather than a professional nature.

On the advice of Dr. Cushing, Stark, accompanied by his wife, went to Chicago in October, 1922, and submitted to an examination by Dr. Robert A. Babcock, a heart specialist. Dr. Babcock diagnosed the trouble as heart disease (myocarditis) and obesity. He told Stark that he was much too fat and that he would have to reduce, also that he had an enlarged heart. He advised him that his improvement depended upon his own good sense, his care of himself and that if he followed instructions he would be all right. Stark's weight on this date had fallen to 210 pounds. In a letter to Dr. Cushing, Dr. Babcock stated that the first thing that struck him was Stark's weight and an undue abdominal development and that he had a greatly enlarged heart with a systolic pressure of 160 over a diastolic of 105. Dr. Babcock, in the letter, recommended the usual treatment for such cases, especially dieting, that Stark could exercise cautiously and that it would be well, as it would take the patient's mind off himself, if he could attend to business a portion of each day. He further stated

that Stark would be benefited if he followed instructions, though his restoration to complete health was impossible. Dr. Cushing died in 1924.

After leaving his desk in May, 1922, Stark never returned to it, although he did return to the factory at times on social visits. He resigned as an officer of the Harshaw, Fuller & Goodwin Co., to take effect July 1, 1923, and in June, 1923, sold, effective July 1, 1923, all his common stock to a fellow stockholder. This sale was made pursuant to an agreement which will be referred to later.

From May, 1922, until his death Stark lived either in his town house in Elyria, Ohio, or at his country home in Lorain, Ohio, which is about nine miles from Elyria. During all this time he was up and down and in and out of his bed and house. On New Year's day, 1923, he and his wife, who had been spending some time at their country home at Lorain, moved to their town residence. They used their own cars and those of relatives to bring in various things such as silverware, etc. None of the party thought Stark looked any worse than usual. All they noticed was his short breathing and wheezing when overexercised, and his loss of flesh. He, himself, drove one of the cars. During the summer of 1923, Stark talked frequently of going to Europe. During the latter part of August, 1923, he purchased an open Packard car, although at that time he had other cars. He desired an open car for touring purposes. He stated he intended to take a trip to the mountains and for this reason wanted special equipment. On the day the car was delivered, he drove it to Lorain, Ohio, and back. He drove it often thereafter. The last time he drove it was the Thursday before his death. His relatives and friends could not, until the very last, detect from his manner or conversation, that he, in any way, realized the seriousness of his condition, or that he thought that death was impending. The only change in his appearance they noticed was his loss of flesh, which they attributed to his dieting.

Up to 1913, the capital stock of the Harshaw, Fuller & Goodwin Co. was represented only by shares of common stock. On September 23, 1919, the stockholders of the company entered into an agreement to the general effect that the holdings of any stockholder should be sold to no outside party but should be offered to the other stockholders at prices fixed by the agreement and that in the event of the retirement from the company by death or resignation of any common stockholder, the option could be exercised by the remaining stockholders. About the same time the corporation issued shares of preferred stock, of which Stark acquired 438 shares. There was an understanding between the stockholders that this stock would be transferred to their respective wives or families. Three of the officers made such transfers to their respective wives within about two

years from date of issuance of this stock. When Stark received his certificate for the preferred stock, he handed the certificates to his wife, Anna L. Stark, and said: " This is your stock. I want you to have the preferred stock in the Harshaw, Fuller & Goodwin Company." This certificate was placed in a safety deposit vault to which both Stark and his wife had a key. The corporation continued to issue preferred stock, the last issuance being in 1922. Stark first and last acquired 1,841 shares of preferred stock and as each certificate was acquired, he handed it to his wife with words of gift similar to those used in the first instance, and each certificate was thereafter placed in the lock box to which both had a key. The 1,841 shares were transferred on the books of the company to Anna L. Stark in August, 1923.

Prior to 1920, Stark subscribed for and acquired preferred stock of the Elyria Telephone Co. in the amount of $100,000. It was the policy of the company to sell this character of stock to its telephone subscribers, and upon the request of the president of the company, Stark sold from time to time, part of his holdings to the telephone subscribers. In 1920, Stark refused to sell any more of his stock. At that time he held 889 shares. On July 11, 1921, which was Mrs. Stark's birthday, Stark handed to her the certificate representing this stock, saying at the time: " I have been providing a nest egg for you," and " It is a good investment and I want you to have it." This certificate Mrs. Stark placed in the lock box to which we have referred. The dividends on this stock were delivered by the president of the company every quarter to Stark in person, either at his office or his residence. This stock was transferred to Mrs. Stark on the books of the company in January, 1923.

In 1917, and again in 1921 or 1922, Stark purchased shares of stock in the Union Trust Co. of Cleveland, the total number of shares purchased being 471. As each purchase was made, Stark handed the certificate to Mrs. Stark telling her it was a nest egg for her future. Mrs. Stark placed the certificates in the lock box to which we have referred. These shares were transferred on the books of the company to Mrs. Stark on August 20, 1923.

At a time not shown, Stark opened a savings account with the Union Trust Company in Cleveland, Ohio. In the latter part of 1922 or the early part of 1923, he subscribed through a bank of which he was a director, for 500 shares of stock of the Cleveland Electric Illuminating Co. and requested that the stock be issued in Mrs. Stark's name. It appears that at the same time he subscribed for bonds in the same company for Mrs. Stark's benefit. In January, 1923, the stocks and bonds were delivered by the bank to Mrs. Stark. She paid for the stock and bonds with the proceeds of Stark's savings

account in the Union Trust Co., which she withdrew on an order given to her by her husband.

Arthur L. Stark, at the time of his death, was the owner of real estate in the township of Sheffield, County of Lorain, State of Ohio. This real estate may be roughly described as comprising two parcels—(1) lake front property which had a frontage of 960 feet, and (2) the Lane property, which contained 2.85 acres. On this property were situated a large house and five small houses. The lake front property, exclusive of buildings, at the date of Stark's death, was worth $60 per front foot or the total sum of $57,600. The Lane property was worth $1,000 per acre, or $2,850. The large building was worth $10,000 and the five small buildings were worth $2,000 each. The total value of both tracts, including the value of buildings thereon, at the date of Stark's death, was $80,450.

OPINION.

MILLIKEN: There are two issues involved in this proceeding. The first is whether the gifts made by Arthur L. Stark, hereafter referred to as decedent, to his wife of his preferred stock in the Harshaw, Fuller & Goodwin Co., his preferred stock in the Elyria Telephone Co., his stock in the Union Trust Co. of Cleveland, and of his savings account in the Union Trust Co., were made in contemplation of death as that phrase is used in section 402(c) of the Revenue Act of 1921. The other issue is, What was the value as of the date of decedent's death of certain real estate which he then owned?

Section 402 of the Revenue Act of 1921 provides in part:

That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

* * * * * * *

(c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title.

It is vigorously contended that when decedent handed to his wife certificates of stock in Harshaw, Fuller & Goodwin Co., in the Elyria Telephone Co., and in the Union Trust Co., a gift was consummated in each case, and since a large part of these gifts were made long before decedent was afflicted with the malady which

caused his death, such gifts fall outside of the provisions of the statute.

On the one hand, the testimony of the donee is unequivocal on the question of the delivery of each gift and the intention of the decedent to make a gift. On the other hand, there is no testimony indicating that decedent assigned the shares to her or that he even indorsed them in blank, nor is it clear who received the dividends. The checks were, of course, payable to decedent until the stocks were transferred on the books of the various corporations. What became of these checks or their proceeds is by no means clear. It would seem that they were deposited in bank to credit of decedent. Whether his wife had the right to draw upon these bank credits is uncertain. When she purchased the stocks and bonds of the Cleveland Electric Illuminating Co. she used an order given her by decedent in order to withdraw the money from the bank. On this point the petitioner contends that a valid gift of corporate stock can be effectuated even when the stock has not been transferred on the books of the corporation, where it was not indorsed even in blank, and where the donor collected the dividends. She cites in support of this contention, *Grissom* v. *Sternberger* (C. C. A.) 10 Fed. (2d) 764; 5 Am. Fed. Tax Rep. 5812. In this proceeding no one has testified as to the delivery of the stocks except the donee. We find in the record testimony given by the presidents of the Harshaw, Fuller & Goodwin Co. and the Elyria Telephone Co. relative to conversations had with the decedent subsequent to the date on which the donee testified the stocks were delivered to her. In these conversations it would seem that the decedent spoke of the transfers of the stocks to his wife as something to be done rather than something accomplished. It may be true, as contended by petitioner, that the word " transfer " as used by decedent referred to transfer on the books of the corporations. In view of the conclusions we have reached, we do not decide whether the gifts were in fact consummated at the dates the stocks were delivered.

Conceding, for the purpose of this opinion, that the various stocks were not given to decedent's wife until they were transferred on the books of the corporations, the question remains whether they were given in contemplation of death.

Since all the transfers were made on the books of the corporations in 1923, and decedent's savings account was transferred to his wife the same year, and since decedent died on October 17th of the same year, we are met at the outset with the provision of the statute to the effect that all gratuitous transfers made within two years prior to a decedent's death shall be deemed to have been made in contemplation of death, unless the contrary is shown. The Court of Claims construed this provision in *Meyer* v. *United States*, 60 Ct. Cls. 474.

After referring to the difficulty of establishing the mental state at the time of the transfer of one who is dead and after quoting section 402(c) of the Revenue Act of 1918, which is in the same words as the corresponding provision of the Revenue Act of 1921, the court said:

But what is the result? Can it go further than to shift the burden of proof, leaving the presumption to prevail in the Government's favor in the absence of a reasonable showing to the contrary? Taxing statutes, when of doubtful interpretation, are always to be construed in favor of the taxpayer, and the spirit of this rule must be completely ignored if, in determining a question of fact as between the Government and the taxpayer, rigorous rules as to the proof required to overcome the presumption of the law are to be applied. For if the Government was deemed entitled to a presumption in its favor because of the difficulties of proof, it is to be borne in mind that even though a conveyance was in fact not in any degree made in contemplation of death, the personal representatives might and frequently would be beset by many difficulties in proving that negative fact. Circumstances must largely be relied upon, and these should be fairly—indeed, we think liberally—construed in favor of the taxpayer.

We concur in this construction and applying it to the facts of this proceeding, the question for decision is whether at the time the stocks were transferred to decedent's wife on the books of the various corporations, and at the time decedent gave her the order on his savings account, did decedent have a then present apprehension arising from his physical condition, which created a reasonable fear that death was near at hand, and was such apprehension the direct and animating cause of the transfers? See *Rea* v. *Heiner*, 6 Fed. (2d) 389; 5 Am. Fed. Tax Rep. 5470; *Shwab* v. *Doyle*, 269 Fed. 321; *Spreckels* v. *State*, 30 Cal. App. 363; 158 Pac. 549; *Philip T. Starck, Executor*, 3 B. T. A. 514; *Spencer Borden, Executor*, 6 B. T. A. 255.

We know decedent was suffering from a mortal disease. We know that he gave up his business and sold his stock in the concern he had helped to make successful. Respondent contends that not only was he mortally ill, but that he knew that death was impending and that this knowledge was the motivating cause of the gifts. We have before us a typical case, one side asserting that decedent had one leg in the grave and knew it, and the other side contending that he believed, and had reasonable grounds to believe that he would live his life's allotted span and that his gifts were made as a result of a plan which he had made long before he was a sick man. He is dead and can not now reveal to us his thoughts and motives. We can only look back to what he said and did during the period involved and to his general conduct and demeanor.

Decedent's wife and his family connections were not alarmed. His family physician is dead, but Dr. W. B. Hubbell, the physician who was called in his stead from time to time, has testified. We make the following excerpt from his testimony:

Q. And what was his general mental attitude from your observation toward his own condition?

A. Well, he never discussed that with me as to how sick he was. He never asked—he never questioned me about how the outcome might be. Not being his family physician he didn't discuss that with me.

Q. Did he seem to be depressed about it at all?

A. Not particularly; no.

Q. Did he talk to you at all like he expected to get well?

A. Well, I think he did. He seemed to as far as I could judge even at the last.

Q. You mean the last week of his illness?

A. I don't remember how many days I saw him before he died, now, I can hardly—I don't know as I can state. During the last few days that I saw him he never talked as though he realized that he wasn't going to get well.

J. A. McGean who is president of the Harshaw, Fuller & Goodwin Co., and who had known decedent since 1912, testified:

Q. Did he at any time in either '22 or '23, particularly '23, say anything to you in regard to how seriously ill he was?

A. He never would admit that he was seriously ill. He never talked about his condition as being anything but a temporary one and that he was going to get over it right away.

Q. Was that right up to the last?

A. Yes; always anxious to talk about business. If he had any discussion about the future it was always what he was going to do when he got around again in a business way.

Q. In other words, he was looking forward to that time when he would get back to business?

A. Oh, yes; yes.

\*  \*  \*  \*  \*  \*  \*

Charles H. Price, who knew decedent intimately, testified:

Q. Did Mr. Stark discuss with you at any time during 1923 the condition of his health?

A. Why, of course, during Mr. Stark's illness I always inquired about his health, but at any time he never gave me the idea that he considered himself seriously ill and at various times talked about his returning to business.

\*  \*  \*  \*  \*  \*  \*

During the summer of 1923, decedent contemplated a trip to Europe and often talked about it. Less than two months before his death, he purchased a new Packard car. He bought an open car with special equipment in order that he might take a journey. He, himself, often drove this car. He drove it on the Thursday preceding his death. If we are to adopt respondent's theory of this case, which is that decedent knew that he was constantly in danger not only of imminent but even of sudden death, then his activities were those of a demented person. However, no one testifies that decedent did not, at this time, possess the same strong, vigorous mind which made his company a success. From the evidence before us, we reach the conclusion that petitioner has fully rebutted the presumption relative to transfers made within two years prior to death.

But not only must decedent have lived in fear that death was near at hand, but such fear must have been the direct and moving cause of the gifts. While we have not decided whether the gifts of stock made in 1913 and other years were completed gifts, we have found as a fact that decedent did deliver the certificates to his wife with words of gift. This action showed that long prior to his illness, decedent had resolved to give these stocks to his wife. Why the stocks were not transferred on the books of the corporation we do not know, but it clearly appears that fear of impending death was not the animating, much less the sole cause of the transfers. This same purpose runs through all his gifts, the earlier as well as the later ones.

Looking at all the facts, as found in the testimony, and judging this man's intention by his words and deeds, and giving full credence to the testimony of his wife, we are of the opinion that respondent erred in including these transfers in the gross estate of decedent.

The only remaining question is what was the value as of decedent's death, of certain real estate then owned by him. We have found that the value of decedent's property at the date of his death, in the Township of Sheffield, County of Lorain, State of Ohio, consisting of the lake front property having a frontage of 960 feet, and the Lane property which contained 2.85 acres, was $80,450. This is the value fixed upon this property by three experienced real estate dealers who testified in behalf of the petitioner. Respondent introduced no testimony whatever on the value of these properties.

The only other piece of property relative to the value of which testimony has been adduced is No. 232 East Avenue, Elyria, Ohio. This was the residence of decedent in his lifetime. After the marriage of decedent's widow to Lavelle, they purchased a home in Cleveland, and therefore desired to sell the Elyria residence. The only witness introduced relative to the value of this residence was Lavelle. He does not attempt to testify as to the value of this property as of the date of decedent's death or at any other time. He testified merely that certain offers were made to him for the property, which he refused, and that he offered to sell at a higher price which he could not obtain. He does not state when these offers were made. They may have been made long after the death of decedent when property values may have changed. We have no competent testimony from which to determine, and therefore, we do not determine the value as of the date of decedent's death of the residence in Elyria.

*Judgment will be entered upon 20 days' notice, under Rule 50.*

Considered by MARQUETTE, PHILLIPS, and VAN FOSSAN.