In the Matter of the Estate of ELBRIDGE G. SPAULDING, Deceased.

THE COMPTROLLER OF THE STATE OF NEW YORK and Others, Appellants; EDWARD R. SPAULDING and Others, Respondents.

*Transfer Tax Act — when a gift* inter vivos *is not "made in contemplation of the death of the grantor."*

A gift *inter vivos* is not a transfer "made in contemplation of the death of the grantor," within the meaning of the Taxable Transfer Act (§ 1, chap. 399, Laws of 1892, re-enacted in § 320, chap. 908, Laws of 1896), unless made under circumstances which impress it with the distinguishing characteristics of a gift *causa mortis*, or unless made with the purpose of evading the provisions of the Taxable Transfer Act.

A man about eighty-six years old, whose mental faculties were unimpaired, but whose physical powers were gradually deteriorating, although he was not afflicted with any acute disease, told his son that he had become a very old man and that his estate was a burden to him; that he intended to give it ultimately to his children, and proposed to give some of it to them at that time. He thereupon gave to the son securities valued at more than $1,000,000 to be divided equally between himself and his brother and sister; and about a year later the father repeated the statement and increased the gift to $1,500,000. The securities were delivered unconditionally into the possession of the children and became subject to their absolute dominion. They collected the interest coupons attached to the securities and were assessed thereon, the father's assessment being reduced proportionately. The father, who died about a year after making the second gift, never saw the securities after he had given them to the children, and never exercised, or attempted to exercise, any control over them in any respect whatever.

*Held,* that the gifts were not transfers "made in contemplation of the death of the grantor," within the meaning of the statute relating to taxable transfers.

SPRING and WILLIAMS, JJ., dissented.

APPEAL by the Comptroller of the State of New York and others, from a decree of the Surrogate's Court of the county of Erie, entered in said Surrogate's Court on the 27th day of January, 1898, modifying an order made on the 5th day of November, 1897, which confirmed the report of the appraiser appointed under the Taxable Transfer Act to fix the value of the property of which one Elbridge G. Spaulding died seized, and which was subject to taxation under said act.

On the 5th day of May, 1897, Elbridge G. Spaulding died in the city of Buffalo, N. Y., leaving property, mostly personal, of the value of about $3,000,000. By a last will and testament he devised

his entire estate, with the exception of about $100,000, to his three children, Edward R. Spaulding, Samuel S. Spaulding and Charlotte S. Sidway, share and share alike. He appointed the respondents Edward R. Spaulding, Franklin Sidway and Charlotte S. Sidway the executors and executrix of said will, which was duly admitted to probate, and they duly qualified and are acting as such.

On the 29th day of June, 1897, an appraiser was duly appointed, pursuant to the provisions of the Taxable Transfer Act, to determine the fair market value of the property of which the testator died seized, and which was subject to taxation.

On the 4th day of November, 1897, the appraiser reported that the value of the estate which passed by the will was $2,905,846.32; that of such amount $937,117.44 went to each of the decedent's three children above named. He also reported that the deceased had made two gifts "in contemplation of death" to his said three children, aggregating $1,500,000, and that that sum and the property which passed by the will was all subject to taxation. The report so made was confirmed by the Surrogate's Court.

Thereafter an appeal was taken from such determination to the surrogate, and after hearing all the evidence offered by the parties interested, it was held that the gifts made by the deceased were not made "in contemplation of death," within the meaning of the statute, and were not taxable, and the order confirming the report of the appraiser was modified accordingly. From the order so modifying the order of confirmation this appeal is taken by the Comptroller of the State of New York, and by the district attorney and county treasurer of Erie county.

*Percy S. Lansdowne* and *Timothy E. Ellsworth*, for the appellants.

*Adelbert Moot* and *Henry W. Sprague*, for the respondents.

McLENNAN, J.:

The sole question presented by this appeal is, were the gifts made by the decedent to his three children, aggregating $1,500,000, made in contemplation of death, within the meaning of the statute?

Chapter 399 of the Laws of 1892, which was in force when the first gift in question was made, provides:

"§ 1. **Taxable transfers.**— A tax shall be and is hereby imposed upon the transfer of any property, real or personal, of the

value of five hundred dollars or over, or of any interest therein or income therefrom, in trust or otherwise, to persons or corporations not exempt by law from taxation on real or personal property in the following cases:

"1. When the transfer is by will or by the intestate laws of this State, from any person dying seized or possessed of the property while a resident of the State.

"2. When the transfer is by will or intestate law, of property within the State, and the decedent was a non-resident of the State at the time of his death.

"3. When the transfer is of property made by a resident or by a non-resident, when such non-resident's property is within this State, *by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor,* or intended to take effect in possession or enjoyment, at or after such death. Such tax shall also be imposed when any such person or corporation becomes beneficially entitled, in possession or expectancy, to any property or the income thereof by any such transfer, whether made before or after the passage of this act. Such tax shall be at the rate of five per cent upon the clear market value of such property, except as otherwise prescribed in the next section."

These provisions were incorporated verbatim in chapter 908 of the Laws of 1896, section 220, which was the statute in force at the time the second gift in question was made, and at the time of the decedent's death.

The deceased, at the time of his death (May 5, 1897), was eighty-eight years of age. He had resided during the greater part of his life in the city of Buffalo, and had accumulated a fortune aggregating about $4,500,000, which consisted almost entirely of personal property. His wife died in August, 1895, and his only children living at the time of his death were the respondents Edward R. Spaulding, Samuel S. Spaulding and Charlotte S. Sidway. Some years prior to his death (the exact time is not disclosed) the deceased made a will by which he disposed of his entire estate, and by which he devised his entire property to the respondents above named, share and share alike, with the exception of about $100,000, which he devised to collateral relatives and charitable institutions.

Prior to 1895 the deceased had been an exceedingly strong,

healthy, robust man; was engaged in banking and other business enterprises, to which he gave close personal attention. For the purpose of relieving himself to some extent from his business cares, the deceased had permitted his son Edward R. Spaulding to practically represent him in the conduct of his business for ten years prior to his death, but always under his advice and supervision. The deceased made a statement in writing each month of his property and of the dividends coming due, until about March, 1896; after that and until about March, 1897, because of the tremulous condition of his hand, the son wrote the statements at the dictation of the father; after that time no statements were made.

The deceased had never been sick or required the services of a physician until about the middle of March, 1897, less than two months prior to his death. In the winter of 1895–1896, a few months after the death of his wife, the deceased became quite feeble physically, which feebleness gradually increased until his death, which was caused, as stated in the certificate of the attending physician, by " old age." The deceased was at no time afflicted with an acute disease; there was simply a gradual depletion of physical power, commencing shortly after the death of his wife in August, 1895, which became more and more marked until his death, two years later; but during all that time his mental faculties remained unimpaired.

Cordial and friendly relations had always existed between the deceased and his children. He lived alone after the death of his wife; his children were attentive to his wants and considerate of his wishes, but he had never given them any considerable amount of property prior to 1895.

In November, 1895, the testator called his son Edward R. Spaulding into the banking office, and told him in substance that he (the testator) had gotten to be a pretty old man, or a very old man; that his estate was a burden to him; that he intended to give it ultimately to his children, and proposed to give some of it to them at that time. The deceased thereupon gave to the son securities amounting in value to $1,038,900, to be divided between himself and the other two children equally. The son took the securities, locked them up in a box, labeled it with the names of the three children, and put it back where it had been kept by the father.

In July, 1896, the deceased sent for his son Edward to come to his farm on Green island, where he was stopping for the summer, and repeated in substance the statement which he made when the first gift of securities was made; said that he wanted to increase the amount so that each of his children would have $500,000, and told his son to make up a list of bonds for that amount and submit it to him. The son did so two or three days later; then the deceased told the son to go to the safe and get the bonds, which he did; these bonds amounted to $461,100, and with the securities previously given aggregated $1,500,000, or $500,000 to each of the children.

These securities were placed in the box containing the securities which had previously been given, and they were all then deposited by the son in the safe deposit vaults of the Marine Bank in the city of Buffalo, deposited in a box taken in the name of the donees, who had the combination, so that any of them had access to it. The testator never saw any of the securities after they were given to the respondents as above stated; never exercised or attempted to exercise any control over them in any respect whatsoever. All the interest coupons which remained attached to the securities were collected by and paid to the donees; each of the donees was assessed a small amount on account of being the owner of such securities, and the assessment on the testator's property was reduced proportionately, but such assessments and reduction did not represent the actual value of the securities transferred.

The evidence clearly shows that the gifts were of such a character as to immediately pass the title to the property which was the subject of the gifts from the father to the children; that the securities became absolutely their property; were unconditionally in their possession, and were not in any manner subject to the control or domination of the donor. The securities immediately became subject to levy and sale by due process of law in payment of the debts, if any, of the donees, and they had the absolute right to dispose of them either by sale, gift, devise or otherwise.

The facts are not in dispute, and there is nothing disclosed by the evidence which distinguishes this case from the ordinary transaction where a father, in possession of his mental faculties unimpaired, but

enfeebled physically because of old age, gives and delivers property to a son or daughter, relinquishing all right, title and interest in and to the same, and putting it beyond recall and beyond control, except that the amount involved is large.

It may be assumed, considering the age of the deceased at the time of his death, his enfeebled condition, the steady and continued failing of his physical powers, what he said to his son at the time the gifts were made, that the deceased knew he would not long continue to live; that death, at most, was not many years distant, and that he wished his three children to be the absolute owners and possessed of a part of his property before that event should take place; but there is no evidence tending to show that the gifts were made when the donor was *in extremis*, when he was dangerously ill, in danger of immediate death, in peril, afflicted with an acute disease, or anything of the kind. He was simply an old man, feeble as the result of old age, and he must have known that he could not live many years longer; but whether a few months, one, two or five years, was not known to him and could not be determined with any degree of accuracy.

Were the gifts in question made "in contemplation of death," within the meaning of the statute?

It will not be contended that a literal construction of the provision of the statute would be reasonable, or was intended by the Legislature.

If a person, fully realizing that his death is to occur within a few hours, should convey by deed real estate and receive the full consideration therefor, it would not be claimed that the real estate so conveyed would be subject to the tax in question, notwithstanding the conveyance was clearly made in contemplation of death. Or, if a person under such circumstances should transfer personal property in payment of a just debt, and with the avowed purpose of having the matter adjusted before his death, the statute would not apply, and yet the transaction would be within its provisions if literally construed.

A man of middle age, in full health and strength, may transfer his house and lot and other property to his wife, for the purpose of securing her against want in case of his death, and declare such purpose in the deed of conveyance. Clearly such conveyance would be

made in contemplation of death, but if the grantor lived ten, fifteen or thirty years after, the property would not be subject to the tax, and this is so, notwithstanding the transaction is within the precise words of the statute.

A father may have been engaged in business during a lifetime, in which he has accumulated and has invested therein a fortune; he is becoming old, less active, more infirm and feeble, and less able to conduct the business. He concludes to and does give and transfer the business to a trusted son. It was not transferred or received for the purpose of evading the transfer tax, but because the father wished to observe the management of the business by the son before his death, and to be relieved of its burden. The father lives five or ten years after the transfer, which was concededly made because he understood and believed that death was not far distant. So far as he knew there was no immediate danger; he was enjoying the same degree of health at the time he transferred the business to the son that he had enjoyed for years previous. Under such circumstances we think it could not be successfully urged that the property and business transferred were subject to tax under the statute in question, and yet such a transfer would fall directly within its provisions if given a literal interpretation.

In the case at bar, as we have seen, there was nothing to indicate to the decedent at the time the gifts in question were made that he was in immediate danger of death. The evidence only tends to show that he was an old man; somewhat enfeebled; gradually declining in physical power. Whether he was to live one, two or five years he did not know and could not have known; that he was to die immediately or within a few days he had no reason to expect; that he was to die within a few years he knew to a certainty. As a matter of fact, he lived a year and six months after the first gift was made, and ten months after the second gift was made, and up to within two months of his death had never called or required the services of a physician.

It will be remembered that the evidence is uncontradicted that the gifts in question were absolute; that the securities became the property of the donees; that they had a right immediately to sell them and pay out the proceeds in liquidation of their indebtedness, or for any other purpose, or give the avails thereof to charity. If

the donees, the respondents in this case, had thus disposed of the securities, it would hardly be contended that the officials of the State would be entitled to trace them and impose upon them the tax provided by the statute ; and if not, it would be impossible to collect the tax, because an additional burden could not be imposed upon the legatees under the will for that purpose.

The gifts in question were gifts *inter vivos*, and the distinction between such gifts and gifts *causa mortis* is clearly pointed out in *Ridden* v. *Thrall* (125 N. Y. 572). At page 579 the court says, per EARL, J.: "Gifts *causa mortis*, as well as gifts *inter vivos*, are based upon the fundamental right every one has of disposing of his property as he wills. The law leaves the power of disposition complete, but, to guard against fraud and imposition, regulates the methods by which it is accomplished.

" To consummate a gift, whether *inter vivos* or *causa mortis*, the property must be actually delivered, and the donor must surrender the possession and dominion thereof to the donee. In the case of gifts *inter vivos*, the moment the gift is thus consummated it becomes absolute and irrevocable. But in the case of gifts *causa mortis* more is needed. The gift must be made under the apprehension of death from some present disease or some other impending peril, and it becomes void by recovery from the disease or escape from the peril. It is also revocable at any time by the donor, and becomes void by the death of the donee in the lifetime of the donor. It is not needful that the gift be made *in extremis* when there is no time or opportunity to make a will. In many of the reported cases the gift was made weeks and even months before the death of the donor, when there was abundant time and opportunity for him to have made a will. These are the main features of a valid gift *causa mortis* as they are set forth in many text books and reported cases."

In the case at bar the property was actually delivered to the donees. The donor had surrendered possession and dominion thereof to the donees, and the moment the gifts were made the transfers became absolute and irrevocable, and so they fall within the definition of gifts *inter vivos*. The gifts were not recoverable at any time by the donor; would not become void by the death of the donees before the death of the donor, and had none of the distinguishing characteristics of a gift *causa mortis*.

A gift which has all the elements and characteristics of a gift *inter vivos* may 'become a gift *causa mortis* if made *in extremis* or when the donor is under the apprehension of some impending peril; and this may be so although the gift be absolute and irrevocable in form. In such case, if death does not occur or the peril has passed, the donor may recover the subject of the gift. (*Grymes* v. *Hone*, 49 N. Y. 17; 3 Pom. Eq. Juris. § 1150.)

If we bear in mind the distinction between a gift *inter vivos* and a gift *causa mortis*, and that a gift which would otherwise be *inter vivos* may become a gift *causa mortis* if made *in extremis* or under circumstances which would entitle the donor to recover it back, we think the rule may be stated to be that the property transferred by gifts *inter vivos* is not taxable under the provisions of the Taxable Transfer Act, unless made and received with the intent and for the purpose of evading its provisions.

In *Matter of Seaman* (147 N. Y. 76, 77), in discussing the statute now under consideration, the court says: " But then comes the third subdivision, introducing a new case. It reads thus: ' When the transfer is of property made by a resident or a non-resident, when such non-resident's property is within this state, by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after such death.' At this point are evidently referred to grants or gifts *causa mortis ;* that is, those effecting the result of a will or of intestacy by a grant or gift made during life, and so by a different process. The subdivision then proceeds : ' Such tax shall also be imposed when any such person or corporation becomes beneficially entitled, in possession or expectancy, to any property, or the income thereof, by any such transfer, whether made before or after the passage of this act.' If we give this language a general and broad application, making it cover not only grants or gifts *causa mortis*, but also transfers by will or intestacy, we give the act a retrospective operation, and subject to taxation rights of succession which accrued before the statute came into existence. Of course, we ought not to do that upon any doubtful or ambiguous expression. The words of the statute have their full and natural force when applied to the new case, immediately preceding, of grants or gifts *causa mortis*. A grantor may have

conveyed and delivered his deed before 1892, in contemplation of death, and to take effect upon the happening of that event, or reserving a power of revocation as well as the possession or enjoyment, during his lifetime, and the legislature certainly intended to put such a transfer on the same footing as one by will."

In *Matter of Edgerton* (35 App. Div. 125) the court says: "It is argued by the appellants that the act of 1892 is applicable, and that the transfers in question were made in contemplation of the death of the transferrer, and, therefore, within the provision of that act above quoted. That provision was under consideration in *Matter of Seaman* (147 N. Y. 69, 76), and was construed to refer to grants or gifts *causa mortis*. The transfers here in question were not such gifts or grants, for there was no power of revocation. (*Doty* v. *Willson*, 47 N. Y. 585 ; 2 Kent Com. 444 ; *Bliss* v. *Fosdick*, 86 Hun, 162, 173 ; 151 N. Y. 625.) In no event was Mr. Edgerton entitled to revoke the transfers or resume the title. He was entitled to the annuities; he could, if necessary, cause a sale of the stock to pay any annuity unpaid, and that was the end of his right. * * * It is hardly claimed that a gift *inter vivos*, or an advancement simply, would be within the provisions of the law. There would be no succession to title at or after the death. (*Matter of Swift*, 137 N. Y. 77; *Matter of Hoffman*, 143 id. 327.) The title would in such a case have passed absolutely before the death in possession and enjoyment. * * * The transfers here, aside from the trust deed as to the monument, were, I think, intended to take effect in possession and enjoyment at the time they were made, and, therefore, were not within the statute."

This case was affirmed by the Court of Appeals (158 N. Y. 671). (*Matter of Masury*, 28 App. Div. 580; affd., 159 N. Y. 532; *Matter of Bostwick*, 38 App. Div. 223.)

In *Matter of Bostwick* (160 N. Y. 489), in discussing the provisions of the act in question, at page 494, the court says: "If a person intends in good faith to make an absolute gift of his property during his life to others, and thereby to make a provision for them which shall not be contingent as to its possession or enjoyment upon the event of his death, there is no inhibition in the act in that respect."

That the gifts in question were gifts *inter vivos*, were not made

under circumstances which impress them with the distinguishing characteristics of gifts *causa mortis*, were not made by the donor or received by the donees with the purpose or intent of evading the provisions of the statute in question, is clearly established by the evidence ; and we think that, under the authorities, it follows that the property which was transferred by such gifts was not transferred " in contemplation of death," within the meaning of the statute, and is not taxable under its provisions.

It follows that the order appealed from should be affirmed, with costs.

ADAMS, P. J., and LAUGHLIN, J., concurred ; dissenting opinion by SPRING, J., in which WILLIAMS, J., concurred.

SPRING, J. (dissenting) :

Mr. Spaulding made the first gift to his children in November, 1895, of about $1,000,000, and in January following increased it to $1,500,000. The gifts consisted of coupon bonds transferrable by delivery, and the old gentleman detached the coupons so that no interest accrued to his children until January, 1897. He died May 5, 1897, at the age of eighty-eight years. His wife had died in 1895, and the donees were his only children and next of kin and they were in middle life. He had been an active business man of extensive experience, and by dint of thrift and sagacity had accumulated a fortune of $4,500,000, and accordingly after the large sums transferred to his children he still had $3,000,000. He had never before advanced to these children any substantial sums, but with the rigid grasp, so potential with him during his long life, he kept to himself the property he had gotten together. After the death of his wife the physical weakness incident to old age grew upon him perceptibly. While his mind was alert his hand was tremulous, his business to which he had once been attentive was intrusted largely to his elder son. He walked but little and took scarcely any exercise. The son Edward thus described his condition : " At this time, a year ago, father had got to be quite feeble, physically. The feebleness developed, I should say, along in the winter of 1895–96 ; I can't tell just when, but some time in the winter, along about Christmas time or the first of January, when the weather began to grow cold. He was feeling the cold more than he had and was shriveled

up. You know how an old man will kind of shrink and shrivel up. He seemed to feel the cold that winter more than he had. His physical system had gradually been depleted. There never was any sudden change in him." That is, he had no sudden change, no organic disease, but the debility of old age, intensified by the death of his wife, admonished him he was rapidly nearing his end.

Prior to 1891 (Chap. 483, Laws of 1885, § 1, as amd. by chap. 713, Laws of 1887) the imposition of a succession tax could be laid only where the transfer was "made or intended to take effect in possession or enjoyment after the death of the grantor or bargainor." That is, as the statute was originally enacted it related only to a gift *causa mortis*, as the essence of such a gift is that the donor retains control over it during life with the right of revocation and the gift does not become fixed until his death.

By chapter 215 of the Laws of 1891 a radical addition was obviously intended by the law-making power, and this was continued when the Collateral Inheritance Tax Act was re-enacted in the law now designated the Transfer Tax Act (Chap. 399, Laws of 1892), and the same provision was engrafted on the general codification of the Tax Law (Chap. 908, Laws of 1896, § 220, subd. 3).

By this change in the law covering taxable transfers the imposition of the tax was required in two specific cases : *First*, where the gift or transfer was "made in contemplation of the death of the grantor, vendor or donor ;" or, *second*, where it was "intended to take effect in possession or enjoyment at or after such death."

It is to be borne in mind that without this amendment every transfer in expectancy which became operative upon the death of the donor or grantor was already provided for, and that, as I have already suggested, applied to those gifts which were within the definition of *causa mortis*. Under the statute as it then existed a man realizing his death was imminent could make an absolute gift to his children with the manifest purpose of evading this statute and still not come within its provision. To counteract that hiatus in the law the addition was embodied in the statute making the transfer assessable if "made in contemplation of death." This could not have been designed to relate solely to gifts which were to take effect upon the decease of the donor, for provision was already made for them. To what did it apply ? What was the legislative intent ?

We, of course, must assume this graft on the transfer tax tree was expected to produce fruitage. It was not to make plain what was already clear. Significance should be given to substantive words obviously intended to create an entirely new class of property which was to be made subject to this tax. It was not intended that every transfer, though possibly made upon the apprehension of death, common to every one, should be chargeable with the tax. Provision made for the wife or children, though it is in the mind of the husband or parent that such transfer shall be beneficial to the transferee after the death of the giver, should not bring it within the law. The inspiring motive must be that the gift was "in contemplation of death" to the same purpose that a gift is determined to be one *causa mortis*. To constitute one of the latter character it is not indispensable that the donor be *in extremis* (*Ridden* v. *Thrall*, 125 N. Y. 572, 579 ; *Grymes* v. *Hone*, 49 id. 17, 20), but must be apprehensive of death from some imminent peril, or he must realize that death is near at hand, and that fact must·be the motive inducing the gift.

Therefore, the statute does not encompass every gift *inter vivos*, but it seems to me plain it was intended to attach to a gift of that class if made "in contemplation of death." If a man on his death bed, with mind undimmed, desires to cheat the law, he cannot do so, because the gift is an irrevocable one. If that is not the proper interpretation the addition to the statute is emasculated. Unless this be so, the effect would be to restrict its application to transfers *causa mortis*, when the aim was to extend it. If the statute, as it exists, does not apply to gifts *inter vivos*, in any event, then the fact that it was made unquestionably to evade the payment of the tax does not make it subject to it. The intent of the donor is not of the slightest consequence unless the scope of the statute is broad enough to include a gift made "in contemplation of death," even though the title passes to the donee immediately and irrevocably upon delivery. If the words interpolated in the statute do relate to gifts among the living, if made in view of approaching death, then the question of the good faith of the donor, the motive actuating the transfer, and the real controlling purpose, inhere in the statute, and are the significant factors in reaching a solution as to the liability to the tax.

I appreciate that, in the practical working out of the law on this hypothesis, considerable difficulty will often be encountered. That is always the case, however, where any result is dependent upon a question of fact, or where the intent with which an act is done enters in the controversy. The same obstacles arise where it is a matter of proof as to whether a given disposition of property is a gift *causa mortis*.

To summarize the situation, the law, as it stood prior to 1891, did not reach property which had been transferred, unless its devolution was deferred until the death of the donor or bargainor. It did not pertain to the disposition of property made by a man of advanced years, who, appreciating that the damp of death was upon him, absolutely transferred his property just before the cord of life was severed, though done, probably, to avoid the tax. To meet cases of that kind the law was amended, and, as I read it, nothing was added at all unless cases like the present were brought within its compass.

I do not find that the authorities cited countervail this construction of the statute. In the *Masury Case* (28 App. Div. 580), and, also, in *Matter of Bostwick* (160 N. Y. 489), the only question in each instance was whether the gift was one *causa mortis*. There was no claim that it was "in contemplation of death." That provision of the statute was not in question, but the sole inquiry was whether the tax should be imposed pursuant to the 2d clause, making it dependent upon transfers to take effect upon the death of the transferrer. The extract from the opinion of the court in 160 New York, 494, to wit: "If a person intends, in good faith, to make an absolute gift of his property during his life to others and thereby to make a provision for them, which shall not be contingent as to its possession or enjoyment upon the event of his death, there is no inhibition in the act in that respect," has been referred to as implying that the statute is to be restricted to gifts *causa mortis*. It is not susceptible of that interpretation, for the pith of the sentence is that a gift "in good faith,  *  *  *  to make a provision" for the donees, is not within the inhibition of the statute. That is the meat of the amendment to the law. If made in apprehension of death it lacks the element of good faith, and that is unquestionably true if the purpose is to evade the payment of the tax.

The criticism is urged that if the transfer is made absolutely and

the beneficiary should die before his donor, that the property would be liable to the payment of the tax twice. If the death was contingent upon the death of the donor and the transferee died the day after the giver, the same speculation could be indulged in. The tax is a succession tax, and is visited inevitably upon the property each time there is a new taker within the purview of the statute.

In this case the proof depended upon the recipients of the old gentleman's bounty. Their interest was averse to the imposition of the tax. Their *ipse dixit* that the gifts were not in expectation of death would, of course, not be controlling. If Mr. Spaulding was covertly striving to keep from the tax-gatherer this large property, he would not proclaim that purpose from the house tops. We must gather his intention from the circumstances surrounding the transaction. He had large means; he was very old; he was shrewd, economical and evidently inimical to the visits of the assessor; he had been careful in retaining possession of his property, but now, with death at hand, the thrifty habits of a lifetime pressed close upon him, and he sought to place a portion of his large property beyond the reach of this tax so offensive to men of his mould. He would not transfer it all. The hoarded wealth of a long life could not all be turned over to his children. The acumen and frugality of the aged financier, however, were disclosed in the fact that when he delivered the bonds, he retained the coupons assuring himself the interest until January 1, 1897. He did not wish to bring himself within the statute by making the gifts contingent upon his death, but he did, in a measure, retain his hold on his property by reserving the income to himself.

The conclusion to me seems inevitable that these transfers were made "in contemplation of death" and to avoid the payment of this tax.

This statute should receive a fair construction. Not a broadly liberal one which will render every disposition of property by a father to his children amenable to the tax, for such gifts should be encouraged, not obstructed. Nor, by a contrary sweep of the pendulum, a narrow interpretation, whereby it is made effective only upon the gifts of those who are in the throes of death. Each case must be determined by its own peculiar facts. The aim is to reach property where by a reasonable deduction the donor, in apprehension

556 PEOPLE ex rel. ERIE R. R. CO. *v.* WEBSTER.

FOURTH DEPARTMENT, MARCH TERM, 1900.          [Vol. 49.

of death, though not anticipating an immediate collapse, disposes of his property. It may be to evade the law; it may be for a more praiseworthy purpose. Whatever the ulterior object, if it is done "in contemplation of death" it is liable to the tax. Advancing age, the debility incident thereto or the existence of disease may give warning of approaching dissolution and the transfer follows, but usually behind it all is the desire to free the property from this tax. That inwrought in the motive is the desire to be relieved of the burden and responsibilty of caring for the property, does not prevent the gift from being in expectation of death. The motive of relief from care may always be an auxiliary to the chief one of apprehended death.

The order should be reversed and a new trial ordered in Surrogate's Court, with costs to the appellant to abide the event.

WILLIAMS, J., concurred.

Decree of surrogate affirmed, with costs.