## Fink's Estate.

*Husband and wife—Estates by entireties—Survivor takes no new estate— Transfer inheritance tax—Transfer made in contemplation of death—Act of June 20, 1919.*

1. Whenever a deed is made to husband and wife, with the right of survivorship, they take by entireties, and the right to present possession or enjoyment arises at once in favor of both grantees and is not postponed until the death of one or dependent upon which may be the ultimate survivor and the sole owner in fee by operation of law.

2. When land is held by husband and wife as tenants by entireties, each is seized of the whole and not of the half with the right of survivorship; they hold by entireties not by moieties, *per tout et non per my*, and neither alone can divest the interest of the other without that one's consent.

3. Where, as in the instant case, there is a conveyance of real estate to husband and wife by entireties, the status of the grantees is established when the transfer is made; there is immediate unity of possession and enjoyment, and on the death of either, no new estate passes to the survivor; the clause in paragraph (*C*), section 1, of the Act of June 20, 1919, P. L. 521, "or intended to take effect in possession or enjoyment at or after such death," standing alone, would not embrace estates by entireties. Such a transfer, however, may be "made in the contemplation of the death of the grantor," and, if so, the act applies.

4. Whether there is a gift in contemplation of death is always uniformly treated as a question of fact.

Appeal from supplementary appraisement for transfer inheritance tax purposes. O. C. Erie Co., May T., 1922, No. 88.

*William B. Walling*, administrator *d. b. n. c. t. a.*, appears personally.

*Marsh & Eaton, Mr. Eaton* appearing for Mrs. Alice C. F. Frampton.

*Gunnison, Fish, Gifford & Chapin, Mr. Gifford* appearing for William B. Walling, administrator *d. b. n. c. t. a.*, and for Henrietta Fisher.

*A. E. & S. A. Sisson*, for Commonwealth.

CLARK, P. J., Feb. 6, 1925.—Henry G. Fink died testate in the City of Erie Aug. 5, 1919, leaving his estate to his wife and appointing her executrix. She qualified and acted as such until her death, and then William B. Walling was appointed administrator *d. b. n. c. t. a.* of the estate.

An assessment of the direct transfer inheritance tax was made by the Register of Wills upon personal property of the estate and upon all real estate standing in the name of Henry G. Fink at the time of his death.

On July 29, 1919, Henry G. Fink and his wife, Ellen M. Fink, gave a deed of certain described pieces of real estate to Charles Hagenlocher, and he, on the same date, conveyed the same property to Henry G. Fink and Ellen M. Fink, his wife, as joint tenants, with the right of survivorship. The deed was immediately recorded and the grantees forthwith entered into possession and enjoyment of the title as joint tenants, with the right of survivorship in either of them.

The real estate described in this deed was not assessed for inheritance tax purposes as a part of the estate of Henry G. Fink.

The appraisement of Henry G. Fink's estate was made Nov. 5, 1919. Some two years later, Oct. 7, 1921, the Register of Wills, acting under instructions from the Auditor General of the Commonwealth of Pennsylvania, caused an appraisement to be made of the real estate described in the aforesaid deed, and the appraisement amounted to $128,840, and assessed a direct transfer inheritance tax upon this property as a part of the estate of Henry G. Fink, deceased, amounting to $2576.80.

An appeal was taken from this assessment of tax, which is the matter now before the court.

The only question raised by this appeal is whether the real estate described in the aforesaid deed of July 29, 1919, not standing in the name of Henry G. Fink at the time of his death, was, nevertheless, subject to a transfer inheritance tax because, as contended by the Commonwealth, the deed was made in contemplation of the death of the grantor, or intended to take effect in possession or enjoyment at or after his death.

The act of assembly on which the Commonwealth bases its claim was approved June 20, 1919, P. L. 521. The part of this act which relates to the controversy before us is found in section 1 and paragraph (c), and is as follows, the non-essential parts being left out:

"A tax shall be and is hereby imposed upon the transfer of any property, real or personal, or of any interest therein, or income therefrom, in trust or otherwise, to persons or corporations, in the following cases:

"(c) When the transfer is of property made by a resident, . . . by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after such death."

On Aug. 5th following the execution of the deed, which was upon July 29, 1919, Henry G. Fink died as a result of a stroke of apoplexy. His death was sudden and unexpected. Cerebral hemorrhage is given as the cause of his death in the official certificate.

Elliott Bankson, a witness for the Commonwealth, testified that he was elected secretary in 1917 of an insurance company of which Henry G. Fink was a director, and that he regularly attended the meetings of the company during 1917 and 1918, and thought he did not do so in 1919, that physically he failed rapidly in the latter part of 1919, that "my personal opinion was that the last time I saw him, he hadn't long to live," and it was about April 1, 1919, that witness last saw him, as stated in direct examination, but on cross-examination could not swear that he saw decedent as late as April, 1919.

F. T. Bannister, called on behalf of the Commonwealth, testified that he did not know Henry G. Fink personally, only by sight for about twenty years, and that for some four or five years prior to the spring of 1919 he did not see him

at all; in the spring and summer of 1919 "I saw him occasionally; two or three times during the month of June, not much change in him during the times in 1919 when I saw him; there was considerable change between then and when I saw him four or five years before; he seemed to be failing rapidly; two or three times I saw him walking along and he seemed to be talking to himself." On cross-examination, witness never had any talk with Fink, and only saw him three or four times in June.

Dr. J. W. Wright, the Register of Vital Statistics for the City of Erie, testified that the date of death is Aug. 5, 1919, and the cause cerebral hemorrhage (that is, apoplexy), with œdema of the lungs, which is the filling of them with fluid, owing to the fact that the lungs do not respond properly, as a contributing cause, and that decedent's age was seventy years ten months and twenty-one days.

Dr. F. A. Walsh was called for the Commonwealth and testified that he had been the decedent's physician for many years; that Fink visited his office when troubled with indigestion, caused by eating too much; that ten or fifteen years ago he had attended Fink when ill with typhoid fever.

The witness further testified that he was called Aug. 1, 1919; his illness then happened after eating his lunch, and that Fink seemed in a pretty serious condition. The next morning he showed signs of apoplexy; that from the time of the typhoid fever illness up to his last sickness there was nothing the matter with Fink except indigestion; that Fink was able to get around and attend to business; that apoplexy comes on suddenly.

The witness was questioned: "Q. What would you say from your knowledge of Henry G. Fink as to whether, on July 29, 1919, three days before your call to see him, he had, or had occasion to have, any contemplation or expectation of death? A. I don't think he expected to die, any more than I do now. He didn't anticipate death even when I saw him on the 1st. Q. Then you would say that down to Aug. 1st he had no anticipation or contemplation of death? A. I don't think he had. Q. Was there any reason why he should have? A. None whatever. Q. You have heard the testimony as to his age being seventy years. Would you say that his age, under the general circumstances existing then, had anything to do with or made him more liable to the occasion that ultimately caused death? A. I would say not. I have had them from thirty years up who died of apoplexy. Q. Is it a fact or not that a man along in years is more liable to die from that cause than a younger man? A. I don't think he is any more apt to have apoplexy, if you take the percentage of cases of apoplexy, and it is very small. Q. Will you state from your professional knowledge if it is not a fact that a man seventy years old is more liable to die from an unexpected cause than a younger man? A. I don't think that has anything to do with apoplexy. Q. Will you answer the question? A. I can't understand why he is more apt to have apoplexy than a younger man just because he is seventy years of age."

Charles Hagenlocher was the next witness called by the Commonwealth. He testified that his occupation is real estate, that he was the grantee in the transfer of the real estate in question from Henry G. Fink and wife, and that he was also the grantor conveying the same land to Henry G. Fink and his wife, with the right of survivorship. On being questioned as to whether there were any leases assigned at the time, he stated that he had no recollection of any, but that "there was a lot of papers signed at that time," but he didn't think there was any assigned. The transfer took place at Mr. Fink's house, and Mr. Fink was up and around, in good health, in the same condition he had been; that there was nothing about him that the witness could see that indi-

cated he was in contemplation or expectation of death; that Mr. Fink had previously talked to him about making a conveyance of the land under consideration; he couldn't tell how long before, but several years; and that Mr. Fink had talked with him about putting a part of his property in the joint names of his wife and himself, and had done this at least two years before July 29, 1919; that he had been acquainted with Mr. Fink for some time, who had consulted him about his business affairs. To the following question, "What, if anything, was there about this transfer on July 29, 1919, to indicate that it was done in contemplation or expectation of death on the part of Mr. Fink?" answered, "There wasn't anything. It was carried out on the idea that he had been talking about for some time."

Albert E. Rose was called by the respondent and testified that he had known Mr. Fink for some time, and that he had worked for him for several years, though not in his continued employment at the present time, but that he was in the habit of going to Mr. Fink's house three or four times a year, covering a period of three or four years, and during the year previous to his death, for checking up Mr. Fink's bank account, etc.; that he, the witness, was the notary before whom acknowledgments were taken in Mr. Fink's office at his home, and that his condition was about the same as it had been on previous occasions. He was dressed as usual. And to the question "What, if anything, did you observe about him that was unusual?" answered, "Nothing." And to the further question, "What, if anything, was there about the transaction to indicate that Mr. Fink was in expectation or contemplation of death?" answered, "Nothing, to my knowledge." On cross-examination, the witness stated that Mr. Fink "seemed to be getting more feeble physically."

Charles H. Fisher was called by the respondents, testified that he was a son-in-law of Henry G. Fink and had been acquainted with him since 1902, and that he was in Erie from Feb. 6, 1918, and during the year 1919, and saw Mr. Fink daily when Mr. Fink was at home; that he traveled more or less; that he lunched with Mr. Fink on the first day of August, and then went to his, the witness's, office and about an hour later received a call from Mrs. Fink to come back to the office at Mr. Fink's home; that Mr. Fink desired to see him about signing three or four checks and Fink seemed to be angry; that there evidently had been some dispute whether he should sign checks without his, the witness's, presence; that Mr. Fink signed them after being told by the witness that they were O. K. The witness left the house about one o'clock and by two o'clock was back again, and it appeared as though Mr. Fink had been afflicted by a stroke, though the witness did not know it was a stroke until the next morning, when he was paralyzed and never recovered.

He noticed nothing up to the first day of August about Mr. Fink's physical appearance except that he was losing weight. He had no serious illness prior to this stroke. On being asked, "Was there anything in your knowledge of Mr. Fink or his condition to cause him, on the 29th of July, 1919, to have any apprehension or expectation of death?" answered, "Absolutely nothing." To a further question, "Have you any knowledge as to whether he had had or had not had any contemplation for some time prior to that date of putting a portion of his property in the names of his wife and himself?" answered, "Yes, sir. He had frequently talked about having joint deeds for the property, and had done so for eight or ten years back." The witness further stated that on the last day of July, at lunch, he told Mr. Fink that he had to hurry back to his office to complete his report. He was here at that time on Government duty. Mr. Fink walked with the witness from his home on West Eleventh Street to the office in the post-office building, stopped for a

few minutes in the building, engaged in conversation with a party, and then went into the elevator and up to the witness's office. He remained there until the witness had to go to the Erie Forge and Steel, and, on calling for an automobile, Mr. Fink was taken home. The witness further stated that Mr. Fink for some years prior to his death was anxious to eliminate all business as much as possible. That prior to the date when he was stricken with apoplexy, he was going around and attending to such business as he cared to every day. "Q. What, if anything, had you seen about him that indicated in any way an apprehension or expectation of death? A. Nothing whatever. Q. Do you know whether he had in mind for some time before this in planning for a division of the property? A. Yes; he had frequently discussed it with me, and the transfer was exactly in accordance with what he had talked with me. Q. His thought was, as expressed to you, that he wanted his property to go to his wife? A. That not only he but his wife was the earner of what he had acquired, and that she was entitled to everything he had, and he didn't want any question to come up as to her having sufficient funds. Q. Eight or ten years before his death he talked of having his property put in a joint deed with his wife? A. Yes."

William B. Walling, a member of the bar, testified that he did not know Henry G. Fink until just before his death; that he prepared the deeds in question, was present at the execution of them, and to the question, "What, if anything, did you notice about Mr. Fink's physical condition?" answered, "The only thing was he seemed a little weak. Otherwise he was all right, mentally and physically." "Q. What, if anything, was there about his appearance or his speech or expression to indicate that he was in apprehension or contemplation of death? A. Nothing that I could see."

Attention was called to the alternative part, which we have italicized, of the Act of June 20, 1919, P. L. 521, which is contained in the following: "Made in contemplation of the death of the grantor, vendor or donor *or intended to take effect in possession or enjoyment at or after such death.*"

The Commonwealth contends that the transfer did not take effect in possession or enjoyment until after the testator's death, and that then possession and enjoyment became effective in the survivor, the wife of Henry G. Fink.

Whenever a deed is made to husband and wife, with the right of survivorship, they take by entireties, and the right to present possession or enjoyment arises at once in favor of both grantees and is not postponed until the death of one or dependent upon which may be the ultimate survivor and the sole owner in fee by operation of law.

The legal incidents which attach to estates by entireties are not the same as those which adhere to land otherwise held; there are several differences; it is not necessary to refer to all of them.

When land is held by husband and wife as tenants by entireties, each is seized of the whole and not of the half, with the right of survivorship; they hold by entireties, not by moieties, *per tout et non per my,* and neither alone can divest the interest of the other without that one's consent: Fairchild v. Chastelleux, 1 Pa. 176, 181; Meyer Estate (No. 1), 232 Pa. 89, 94.

It was held in Meyer's Estate (No. 2), 232 Pa. 95, 96, that no present right of enjoyment results to one claiming through the husband or his right, so long as the wife survives, and that her "right to present enjoyment of the estate is not to a part but to all of it;" that is, the right of both during life; each has a present right of enjoyment at the time when the transfer is made and not, in the instant case, to a postponed or deferred enjoyment.

Fink's Estate.

In Meyer's Estate (No. 2), 232 Pa. 95, 96, the court refers to an opinion of Judge Thayer in the District Court of Philadelphia, from which an appeal was taken, but which was adopted in McCurdy v. Canning, 64 Pa. 39, as the law and since consistently followed. What Judge Thayer said is found on page 40, et seq., of this case, and may be profitably read by any one desirous of knowing what are the chief characteristics of estates by entireties. A brief quotation follows: "Of such an estate, as Montague, C. J., says in Plowden, 58, 'the husband has the entire use and the wife the entire use, for there are no moieties between husband and wife.'"

The enjoyment or possession in the present case is not dependent on the happeing of some event in future, but immediate.

In Carr's Estate, 30 Dist. R. 481, decided by Judge Gummey, May 20, 1921, on an appeal from a levy of taxes by the Register of Wills, after quoting provisions of the Act of June 20, 1919, § 1 (c), P. L. 521, the court said:

"When the same question arose in the State of New York under a statute which, for purposes of this discussion, may be considered as identical with the Pennsylvania statute (In the matter of Tilley, 166 N. Y. App. Div. 240), where bank deposits were held by a husband and wife jointly, payable to either or the survivor, it was decided that, on the death of the husband, the deposits were not taxable as part of his estate, the court saying: 'The great incident of joint tenancy is the right of survivorship, and by reason of this right the interest of a joint tenant is not descendible and cannot be devised by will: 17 Am. & Eng. Ency. of Law (2nd ed.), 650. No right passes by the death of one of the parties, for where the deposit is in the joint names of the parties and the intent appears—as it now must under the statute—to create the joint tenancy, its effect is to vest title in the entire fund in the survivor. The right of survivorship vests in the creation of the joint tenancy, and the only question determined by death is, which shall take the entire estate;' and to the same effect are other decisions, not only in New York, but in other jurisdictions, where the statutes relating to inheritance taxes are similar to the Pennsylvania statute."

And, further, if the case before the court at that time "were a case of tenancy by entireties, the hearing judge would unhesitatingly disallow the tax, as an estate by entireties cannot be defeated by the action of either of the parties (see Meyer's Estate, 232 Pa. 89, 95; Beihl v. Martin, 236 Pa. 519), but this is not true of an estate held in joint tenancy."

The distinguishing characteristics of tenancy by entireties must be borne in mind and observed.

In the annotation above referred to an instructive summary relating to these two estates is found in 7 Amer. Law Reps. Ann. 1032, and is as follows:

"In the case of joint tenancies there are two transfers that have been urged as taxable: There is (a) the transfer of the property to the joint tenants; and (b) the succession to the whole estate by the survivor upon the death of one of the joint tenants. It seems clear that there is no transfer in contemplation of death in the succession to the entire property by the survivor upon the death of one of the tenants. Whatever transfer or succession takes place at this time is a transfer or succession at death and not in contemplation of death. It is stated in In re Tilley, 166 N. Y. App. Div. 240, 151 N. Y. Supp. 79, affirmed without opinion in 215 N. Y. 702; 109 N. E. Repr. 1094, that no right passes by the death of one of the parties, for where the deposit is in the joint names of the parties, and intent appears, as it now must under the statute, to create the joint tenancy, its effect is to vest title in the entire fund in the survivor. The right of survivorship vests in the creation of the joint

tenancy, and the only question determined by death is, which shall take the entire estate. Under such circumstances, it is clear that there is no succession to be taxed, for it was not made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after such death. The possession is given upon the creation of the estate; the rights are absolutely and conclusively fixed; and the only question which is contingent is which of two or more joint tenants shall eventually own the entire estate."

In considering estates by entireties, the Supreme Court held, Mr. Justice Stewart delivering the opinion, that "It may be that because of modern innovations on the common law respecting the property rights of married women, the venerable estate, known as estate by entireties, has outlived the purpose of its creation and is out of harmony with present conditions. However this may be, if change is desired, it must come through legislative action and not through judicial construction. The estate is too well established and too well defined to be subject to judicial impairment. Recognizing its very anomalous character, we have been careful, as all our cases show, to give effect to those peculiar incidents which naturally and logically attach, especially to its chief distinguishing incident, which exempts it from the ordinary legal process to which all other estates are subject. Fundamentally, the estate rests on the legal unity of husband and wife; it is, therefore, a unit, not made up of divisible parts subsisting in different natural persons, but is an indivisible whole, vested in two persons actually distinct, yet to legal intendment one and the same. Each is seized of the whole estate from its inception, and upon the death of one, while the right of the survivorship remains to the other, the other takes no new title or estate:" Beihl v. Martin, 236 Pa. 519, 522.

In estates of this kind the legal intendment is that, as to husband and wife, the twain are one, and that the status of each as to possession or enjoyment is fixed when the transfer is made, and in the instant case that was July 29, 1919, and not contingent upon some future event, and that the court's suggested legislative action has not, by the Act of 1919, section 1 (c), as to transfers intended to take effect in possession or enjoyment at or after death, deprived the estate by entireties now under consideration of the legal incidents of immediate possession or enjoyment which attached to it in the lifetime of the grantees.

Where there is a conveyance to husband and wife, "they are but one person in law, and upon the death of either, the survivor takes no new estate:" Beihl v. Martin, 236 Pa. 519.

The cases cited by the Commonwealth do not seem to support the Commonwealth's contention.

In Reish v. Com., 106 Pa. 521, the grantor, suffering from his last sickness, conveyed his property for a nominal consideration to his brother, who gave a bond to the executor for payment to him of the net income of the property. Held, that this bond deprived the grantee of the enjoyment of the property until the death of the grantor, and, therefore, subjected it to the tax.

In Du Bois's Appeal, 121 Pa. 368, the powers reserved to the grantor were such that the mere naked legal title might be defeated at any time. The grantee did not have the possession, enjoyment and title in the grantor's lifetime, and, therefore, the property was subject to the tax.

In Lines's Estate, 155 Pa. 378, the interest and dividends on certain securities conveyed in trust to a trust company were to be collected by the trustee and paid to the person creating the trust during his life, and then he named

Fink's Estate.

beneficiaries; he had also under the reserved power of modification and revocation the control of the disposition of the securities upon his decease. "They were his to enjoy during his life and his to dispose of in any manner he saw fit at any time prior to his decease." He made no change in the beneficiaries mentioned in the deed, and it was held that they were liable for the tax. The facts of the case leave no room for any other possible decision. The court remarks that: "In view of the undisputed facts, it is strange that any question should have been seriously raised as to the right of the Commonwealth to the tax on the securities, or the liability of the beneficiaries to pay their respective proportions thereof."

A reservation of income for life restrains the enjoyment of the *corpus* until the death of the life user, and property so conveyed to another is subject to the tax: Todd's Estate (No. 2), 237 Pa. 466.

The foregoing reservations deferred the sole use of the *corpus* by the grantee until the death of the grantor. The transfers did not become fully effective for the grantee until that event happened, and, hence, were liable for the tax.

It may be contended that the legislature intended that a transfer made in contemplation of death, or intended to take effect in possession or enjoyment at or after death, includes estates by entireties, and that the possession or enjoyment mentioned in the act is referable to the possession or enjoyment of the ultimate sole owner, the survivor, and that the subject-matter of such transfer is subject to the tax.

If the act is meant to cover all property transferred to a husband and wife as tenants by entireties, then it must follow that there is a cloud upon the title of all such transfers for a period of five years, after which there is a presumption of payment, and a purchaser takes the real estate free of a tax lien. Before that time lapses, he would not know whether he had a good or bad title. During the running of the five years there is no way of ascertaining whether the subject of such transfer is or is not liable to tax, other than by proceedings in court to decide whether the transfer was made, *inter alia,* "in contemplation of death," which must be determined from the facts presented to the court.

The authoritative decisions of the Supreme Court on us binding and our guide, as we understand them, are: That where, as in the case before us, there is a conveyance of real estate to husband and wife by entireties, the status of the grantees is established when the transfer is made, that there is immediate unity of possession and enjoyment, and that on the death of either, no new estate passes to the survivor, and, therefore, our conclusion is that the disjunctive phrase above, "or intended to take effect in possession or enjoyment at or after such death," standing alone, would not embrace estates by entireties. They may, however, be "made in contemplation of the death of the grantor," and if so, the act applies.

In the Act of 1919 this language first appears in the statutes of Pennsylvania.

Our attention has been called to only one decision in this State where this phrase has been judicially interpreted, and that was Edwards's Estate, 1 D. & C. 497. In this case it appears that James Edwards, the husband, and the owner of the land transferred through a third person to himself and wife, with the right of survivorship, Nov. 23, 1920, four days after he, Edwards, had been taken to a hospital suffering from kidney disturbance, general breakdown and chronic diabetes, that he had those maladies for some time and that they had become acute Oct. 22, 1920, and that his condition

aroused the apprehension of his physicians as to the ultimate, though not the immediate, outcome, and in this connection the court said: "It may be reasonably supposed that the grantor, who knew his general condition, might have entertained the same apprehension. This, we think, would be within the language of the statute."

His condition at home, before going to the hospital, was described by his physician as "a condition of semi-delirium, a good deal of distress and hardly appreciated things that were occurring from day to day." All of which points to an expectant and impending death soon to occur.

The words "made in contemplation of the death of the grantor" have *verbatim* or in substance been included in the statutes of other states relating to inheritance tax legislation and have been variously interpreted.

The Federal courts have construed a similar phrase in Federal estate taxation cases. There is in the Federal Act a presumption in favor of the Government if the transfer has been made within two years of the death of the grantor, though that presumption may be overcome. It may be helpful to note some of these judicial decisions.

The question to be decided in considering transfers is: "Whether or not a specific anticipation or expectation of death, immediate or near at hand (as distinguished from the general and universal expectation of death), was the immediate cause of the transfer?" Shwab *v.* Doyle, 269 Fed. Repr. 321.

Property may be conveyed free from any transfer tax if the contemplation of death is not the cause which impels the making.

"The act is not done in contemplation of death, when the feeling that dissolution is approaching is absent and is not the cause which impels or prompts the doing of the act. An aged person in good health, who has acquired a competency and who desires to retire from active life, may desire to distribute a portion of his accumulations among his children without any thought of impending death. . . . The question of whether such a person may have a few years or many years to live is not a consideration that is entered into to effect the transfer."

The court further stated that: "(1) The gifts were substantially in accordance with the will of the deceased, made in 1891; (2) they included more than two-thirds of a large estate; (3) the deceased had reached an extreme old age; (4) he had surrendered the management of his property and business;" and the court held that the transfer was not made in contemplation of death: In re Dessert's Estate (Wis.), 142 N. W. Repr. 647.

In another case it appears that: "At the time the transfers were made, the testator was eighty-three years of age. Some three years before he had a very slight paralytic stroke. Its effects had largely, if not altogether, passed off, and for a man of his age he was in a fair state of health until about ten days before his death. Although his physician and neighbor kept an eye upon him, he was able to go wherever pleasure or business called him, and appears to have kept the management of his affairs in his own hands. About the time he transferred the policies in question he unquestionably had on his mind the desirability of making provision for what would happen after he died."

The court held that the transfer was not made in contemplation of death: Gaither *v.* Miles, 268 Fed. Repr. 692.

In another case, where the decedent died at the age of seventy-one years, leaving a large estate, and had nine days before his death transferred to his wife bonds of the value of $273,649.17, notwithstanding the decedent had suffered from diabetes for a period of twenty years, and when the gift was

made had only just recovered, or apparently recovered, from an attack of pneumonia and bronchitis, the court held that the gift was not made in contemplation of death, and in the court's opinion, rendered by Hazel, J., the court said: "It is true he had reached the age of seventy-one years and perhaps would not have lived many more, and he had just recovered from a severe illness, but his usual strength was coming back and he entertained no thought of death. Indeed, no reason existed for thinking that he would be attacked with a streptococcus throat; . . . his attack was unexpected:" Vaughan v. Riordan, 280 Fed. Repr. 742.

Where a decedent had been in ill-health and there was no evidence showing his age or that he believed or had any idea that he was near death, and there was nothing to indicate that his condition was different from what it had been for the past ten years, except that he was ten years older, and died four days after making deeds of land to his children, the court held that they were not executed in contemplation of death: In re Kinter Estate (S. D.), 87 N. W. Repr. 625.

Whether there is a gift in contemplation of death is almost uniformly treated as a question of fact, and cases cited in 7 Am. Law Reps. Ann. 1028.

Referring to the words "in contemplation of death," it has been decided that: "It is, therefore, obvious that they are not used as referring to that expectation generally entertained by every person. The words are evidently intended to refer to an expectation of death which arises from such a bodily or mental condition as prompts persons to dispose of their property and bestow it on those whom they regard as entitled to their bounty:" State v. Pabst, 139 Wis. 561; 121 N. W. Repr. 351.

It would seem that the expectation of death must be the direct, specific and immediate animating cause of the transfer and as the motive without which the transfer would not have been made: Spreckels v. State, 30 Cal. App. 363; 158 Pac. Repr. 549.

A man about sixty-nine years of age, not in any apprehension of immediate death, though subject to attacks of heart disease, conveyed a considerable portion of his large estate to a trustee, and such act was held not to be a transfer in contemplation of death: People v. Kelley, 218 Ill. 509; 75 N. E. Repr. 1038.

The court held that a gift was not made in contemplation of death where that was not the impelling motive for making the gift: People v. Burkhalter, 247 Ill. 600; 93 N. E. Repr. 379.

Where the decedent in his lifetime, being nearly eighty-seven years of age, but with mental faculties unimpaired, although feeble physically because of old age, transferred a third of a large estate to his children, the transfer was held not to be a transfer in contemplation of death, the court stating that: "It may be assumed, considering the age of the deceased at the time of his death, his enfeebled condition, the steady and continuous failing of his physical powers, what he said to his son at the time the gifts were made, that the deceased knew he would not long continue to live, that death, at most, was not many years distant, and that he wished his three children to be the absolute owners and possessors of a part of his property before that event should take place; but there was no evidence tending to show that when the gifts were made the deceased was in extremis, that he was dangerously ill, in peril of immediate death, in peril, afflicted with an acute disease, or anything of the kind. He was simply an old man, feeble as the result of old age, and he must have known that he could not live many years; but whether a few months, one, two or five years, was not known to him and could not be deter-

mined with any degree of accuracy:" In re Spaulding, 49 N. Y. App. Div. 541; 63 N. Y. Supp. 694, affirmed in 163 N. Y. 607.

In still another case the court ruled that the only point to be determined is whether the transfer was made in the belief that the person making it was not going to get well, and made in contemplation of his impending death and for the purposes of defrauding the state of the transfer tax: In re Mahlstedt, 73 N. Y. Supp. 818, affirmed in 171 N. Y. 652. And that decision reversed the decision of the surrogate affirming the tax.

And, again, it was decided in another instance that the contemplation of death that the statutes speak of is a present apprehension of death arising from some existing condition of impending peril, as, for example, when a grantor is in bad health and the impelling thought of death is pre-eminent in his mind, or when he is in the presence of, or there is fear or apprehension of, some danger or peril that might naturally produce an expectation of death: Com. ex rel. Chilton v. Fenley, 189 Ky. 480; 225 S. W. Repr. 154.

A father about four months before his death gave away stock. It was held by the court below that it was made in contemplation of death. It appeared that, although the man was suffering from an incurable disease, he was not aware of its seriousness and was up and about at the time. The lower court was reversed: In re Beyer, 190 N. Y. App. Div. 802; 189 N. Y. Supp. 396.

In another case, where the transfer was made a few days previous to the death, it was held not to be in contemplation of death: In re Wadsworth, 198 N. Y. App. Div. 483; 190 N. Y. Supp. 819.

Applying the principles judicially enunciated in the foregoing cited decisions to the facts of the case at bar, the evidence submitted seems to fail to establish that Henry G. Fink, when he executed the deed under attack on July 29, 1919, was "influenced to do so by such an expectation of death arising from bodily or mental conditions as prompts persons to dispose of their property to those whom they deem proper objects of their bounty," or that "the contemplation of death was the cause which impelled the making of the transfer," or that expectation of death was "the immediately moving cause of the transfer," or that "the feeling that dissolution is approaching" was present, or that he "had any specific cause for apprehending death," or that there was "a present apprehension of death arising from some existing condition of impending peril that would reasonably create a fear that death was near at hand." Age alone is not a controlling factor, though it may be taken into consideration. Surrendering the management of one's estate does not in itself warrant the conclusion that it was done in contemplation of death.

In the instant case it appears that, some years prior to the date of the deed in question, Henry G. Fink had made a will giving everything to his wife, and that he had discussed at various times for some years prior to the date of the deed the carrying out just what the deed effected. The statutory words "made in contemplation of death" do not mean that death which every one to a greater or less degree must and does entertain.

Now, to wit, Feb. 6, 1925, it is adjudged and decreed, and we find, under the evidence submitted, that the deed under consideration, executed on July 29, 1919, was not made by Henry G. Fink in contemplation of death. The assessment is disallowed and the appeal dismissed.

From Lytle F. Perry, Erie, Pa.