ISAAC GIMBEL, CHARLES GIMBEL, DANIEL GIMBEL, AND ELLIS A. GIMBEL, EXECUTORS, ESTATE OF JACOB GIMBEL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11690. Promulgated March 26, 1928.

*A. E. Graupner*, *Esq.*, and *Walter C. Blakeley*, *Esq.*, for the petitioners.

*R. E. Copes*, *Esq.*, and *L. S. Pendelton*, *Esq.*, for the respondent.

224

226

## OPINION.

TRAMMELL: The only error assigned by the petition in this proceeding is that in determining the taxable net estate the respondent erroneously included as property transferred in contemplation of death the amount of $1,466,000, representing the value of the 5,050 shares of the preferred stock and the 31,000 shares of common stock

of Gimbel Bros., Inc., which had been the subject of absolute gifts by the decedent to his brothers prior to his death.

Section 402 of the Revenue Act of 1921 provides in part as follows:

That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

\*  \*  \*  \*  \*  \*  \*

(c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title.

Inasmuch as Gimbel made the gifts of the shares of stock to his brothers on October 19, 1922, and died on November 7, following, there is a presumption under the Act that the gifts were made in contemplation of death. The sole question that we are called upon to decide is whether the gifts made by the decedent were under the facts and circumstances made in contemplation of death within the meaning of that term as used in the Act.

The phrase "in contemplation of death" has often been considered and construed by the courts.

In *Meyer* v. *United States*, 60 Ct. Cls. 474, the court said:

A review of the authorities is scarcely necessary to sustain the proposition that the contemplation of death referred to in the statute is not that contemplation of death which must be present with all of us, mindful of its certainty at some time, we know not when, but it is that state of mind which by reason of advanced age, serious illness, or other producing cause induces the conviction that death in the near future is to be anticipated. If it be said that there need not be a conviction that death is imminent, there must at least be a belief that it is to be expected in the very near future rather than in the usual course of events; and in this state of mind, in this belief in the near approach of death, must be found the motive for the conveyance if it is properly to be characterized as made in contemplation of death.

In *Rea* v. *Heiner*, 6 Fed. (2d) 389, it is stated:

There is a common agreement that the words "contemplation of death" mean not the general knowledge of all men that they must die; that it must be a present apprehension, from some existing bodily or mental condition or impending peril, creating a reasonable fear that death is near at hand; and that, so arising, it must be the direct and animating cause, and the only cause, of the transfer. If this apprehension, so arising, is absent, there is not that contemplation of death intended by the statute, especially when another adequate motive actuating the gift is shown.

In *Spreckels* v. *State*, 30 Cal. App. 363; 158 Pac. 549, the court said:

A reasonable and just view of the law in question is that it is only where the transfer of property by gift is immediately and directly prompted by the expectation of death that the property so transferred becomes amenable to the burden; or, as counsel for the respondents with singular aptness states the proposition: "It is only when contemplation of death is the motive without which the conveyance would not be made that a transfer may be subjected to the tax." That is, the expectation of death must be the direct, specific, and immediate animating cause of the transfer.

In *Philip T. Starck, Executor*, 3 B. T. A. 514, we said:

An act may well be performed in contemplation of death at some time in the future and yet not be in contemplation of death within the meaning- of that phrase as used in the statute. The intention of Congress in the enactment of section 402 of the Revenue Act of 1918 was to provide for the inclusion in the gross estate of the value of any property concerning which the decedent made a transfer, except for a fair consideration in money or money's worth, in contemplation of death within a reasonable time in the near future, as distinguished from the general expectation of death entertained by everyone.

In *Joseph Edward Phillips, Executor*, 7 B. T. A. 1054, we said:

It may be well that when the conveyances in question were made Joseph N. Phillips contemplated death at some time in the future, but men perform acts daily with the knowledge that death may overtake them any moment. Men all wish to accomplish certain things before that fateful day and in that sense things may be done in contemplation of death, but this general and certain knowledge that to all death cometh .soon or late is not what is meant by the phrase "in contemplation of death" as used in the Revenue Act.

Examining the facts in the case in connection with the statute and the decisions above quoted we find that, beginning about 1887, Gimbel and his brothers became associated in business and that this association continued until his death. During all this time, the brothers accepted his advice and direction in the business and their attitude toward him was that of sons toward a father. About 10 years prior to his death and about four or five years prior to the discovery of heart trouble, Gimbel began gradually to relax his activities in the business, especially such physical activities as required his presence at the store for long hours. About the same time he began discussing with his brothers the matter of increasing their holdings in the two corporations by transferring to them some of his shares of stock. These discussions continued until about the year 1922, when the gifts here in controversy were made. During the period of these discussions the Gimbel brothers were attempting to reconcile the Guggenheims and Rosenwald to the idea of consolidating or merging the activities of the Pennsylvania and New York corporations into one corporation. During this period all of the stock Gimbel owned in

the Pennsylvania corporation was pledged as collateral for money borrowed and used in the business of the two corporations. All the money he had was tied up in the business and he was in debt.

From the beginning of their association in the business it was always the idea of Gimbel that each of his brothers should have an equal interest in the business. He was a bachelor, was several years older than the other brothers, and had been associated in business with their father and was better situated financially than they. Through the operation of "the pool" he enabled each to have an equal share in the business. From the formation of the partnership until 1922 all of the brothers with the exception of Daniel were indebted through "the pool" to the decedent. The indebtedness was in unequal amounts, some owing more than others, due to the varying sizes of their families and their different ideas as to the ways of living. Not only were the interests of each in the business equal, but they were receiving equal salaries. Jacob Gimbel was very solicitous that his brothers remain on an equality.

The decedent, while desiring to make a distribution to his brothers of a portion of his interest in the business, felt that the brothers should first pay off their indebtedness to "the pool." This was not possible, however, until the consolidation in 1922. The consolidation not only brought the activities of the two corporations together under the control of one corporation, but provided the brothers with money enough to pay off their indebtedness to the decedent and also enabled them to get out of debt.

The consolidation having enabled the brothers to pay off their debts, and also having left Gimbel free of debt and his interest in the business free of encumbrances, he on October 19, 1922, directed the depositaries to issue to the brothers certificates for the shares of stock here involved. The transfer of this stock was in pursuance of Gimbel's plan formulated as far back as 1912. In the prior years he had planned that his brothers should be rewarded with larger interests in the business by the transfer of some of his stock to them. He was accumulating more capital than his married brothers, who were working harder than he was. He desired that they should be rewarded for their services and the long hours that they devoted to the business.

At the time the decedent began discussing the transfers he was apparently in good health as up until then he had had only occasional illnesses of a minor nature. While at the time the discussions began he may have had heart trouble, it was not apparent and it was not until four or five years later that it was discovered. When first discovered, the heart condition was not serious, nor was he

advised of the nature of his disease. Following the directions of his physician, he took life easy and during the last two years of his life spent a great deal of his time at resorts away from Philadelphia. With the probable exception of the spring of 1922, Gimbel, when in Philadelphia, would spend from about 11 a. m. to 3 p. m. of each day at the store. When away from Philadelphia he was in correspondence with his nephew about the business. While at Atlantic City during the summer preceding his death, he communicated with the Philadelphia and New York stores by telephone and was also engaged in working on the agreements relative to the consolidation and holding conferences with his brothers and others in regard thereto.

While Gimbel had a severe heart attack in Florida during April, 1922, he soon recovered from it. After going to Atlantic City, his general condition gradually improved, and one of his physicians testified that on October 20, 1922, his condition was better than it had been at any other time during the summer. Gimbel had no symptoms of any organic trouble other than that of his heart, and up until the time of his last illness, his physicians found nothing in his condition to cause alarm or lead them to think that death was near.

The decedent's physicians did not tell him of the nature of his condition any more than that his heart needed a little rest. He was never told that his condition was serious.

There is nothing to indicate that Gimbel had any belief or expectation that his death was near at hand or might occur within the reasonably near future. In fact, there is an abundance of evidence to the contrary. At no time did he do or say anything in the presence of his valet, housekeeper, physicians or brothers, which indicated that he was expecting death within the near future. He was always cheerful, showing no alarm about his health and often discussed the longevity of his parents and grandparents and expressed the expectation that he would live as long as they. At the time of his final illness he was making plans for changing his Philadelphia residence to the suburbs, and for spending the following winter in Florida and the next summer in Maine. The decedent had made no will since 1908, after which date the New York store had been established and the consolidation of the Pennsylvania and the New York corporations had been effected.

From a consideration of all the facts in this case we are of the opinion that in making the gifts, Gimbel had no expectation, belief or apprehension that his death was near at hand or might occur in the reasonably near future. Inasmuch as the decedent did not have such a belief, expectation or apprehension, we think the gifts were

not made in contemplation of death, within the meaning of that phrase as used in the Act.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*

MILLIKEN did not participate.

STERNHAGEN and VAN FOSSAN concur in the result.